United States Court of Appeals,

Fifth Circuit.

No. 96-50605.

Karen Hanson MESSER, Plaintiff-Appellant,

v.

Lionel R. MENO, in his former official capacity as the Texas Commissioner of Education;  Mike Moses in his official capacity as the Texas Commissioner of Education;  and the Texas Education Agency, Defendants-Appellees.

Dec. 11, 1997.

Appeal from the United States District Court for the Western District of Texas.

Before REYNALDO G. GARZA, HIGGINBOTHAM and JONES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

This case presents the question whether a white woman plaintiff was unconstitutionally discriminated against in salary and promotion opportunities in the Texas Education Agency, because throughout the relevant period the agency aspired to "balance" its workforce according to the gender and racial balance of the state.  The Agency defends its affirmative action plans and denies that their implementation had anything to do with the plaintiff's individual career.  We find genuine issues of material fact;  TEA's favorable summary judgment is, for the most part, reversed and the case remanded.

BACKGROUND

Appellant Karen Messer was employed by the Texas Education Agency (the "TEA") from 1978 to 1996, when she resigned from her position as Senior Director of the Budget Management Division to accept a position with the Texas Employment Commission (presently the Texas Workforce Commission (the "TWC")).  Messer alleges that she was denied two promotions and was undercompensated because of her race and gender and that she resigned her position at TEA after suffering retaliation against her complaints.

Throughout Messer's employment at TEA, the agency implemented and enforced affirmative

1

action plans ("AAPs") that embodied TEA's commitment to "diversity" in its workforce. The AAPs have been revised and re-adopted annually. Until 1995, they expressed the goal of achieving "a workforce balanced with a proportionate number of minorities and women in the *population."* In 1995, the slightly modified goal of TEA's AAP was to "achieve a workforce balanced with a proportionate number of minorities and women in the *workforce."* Over the years, TEA painstakingly created, maintained, and analyzed statistics concerning the ethnic and gender makeup of its employees and applicants for employment. Monthly reports—known as utilization reports—monitored the number and proportion of minorities and women in TEA's workforce. These reports were apparently distributed each time a job vacancy opened within TEA. Among other evidence of race-conscious employment policies, TEA's Recruitment and Hiring Guidelines instructed its employees, in part:

> Managers should survey their staffing patterns, especially concerning race and sex, when vacancies occur. While persons must ultimately be employed on the basis of job-related criteria, the needs of the unit, which include balanced workforce considerations, should have significant influence on employment decisions.

Messer contends that supervisors based hiring and other employment decisions on race and gender rather than superior merit. She asserts that because, in comparison to the Texas population, women were overrepresented in TEA's workforce, she was discriminated against as a woman when, pursuant to the AAPs, TEA pursued its goal of reducing the number of women in its workforce. Similarly, Messer complains that because, in comparison to the state's population, minorities were underrepresented in some parts of TEA's workforce, she was discriminated against for the sake of TEA's goal of reducing the number of whites in its workforce. More broadly, Messer challenges TEA's AAPs as unconstitutionally discriminatory on the basis of race and sex.

Pursuant to the AAPs, the defendants allegedly discriminated against her in three distinct situations: (1) reclassifying (or as she asserts, "promoting") a black male to a newly created position of TEA "Coordinator" on or about January 1992; (2) selecting a white male over Messer for Coordinator of Internal Operations in January 1994;[1] and (3) paying higher salaries to four senior

_____

[1]Messer contends she was discriminated against in favor of a man because she belonged to an "overutilized" group at TEA—women.

2

directors (two black females and two Hispanic males) who held identical positions and performed work comparable to hers.

Messer filed her formal charge of discrimination with the Equal Employment Opportunity Commission on or about November 2, 1994. She then sued the appellees contending violations of 42 U.S.C. §§ 1981, 1983, and Title VII for alleged race and sex discrimination and asserted a state law breach of contract claim. The magistrate judge granted the defendants' motions for summary judgment and dismissed all of Messer's claims. *See Messer v. Meno,* 936 F.Supp. 1280, 1299 (W.D.Tex.1996). Messer argues on appeal that the court erred only in dismissing her Title VII claims.

STANDARD OF REVIEW

This court reviews the grant of summary judgment *de novo,* applying the same standards as the magistrate judge. *See Duffy v. Leading Edge Products, Inc.,* 44 F.3d 308, 312 (5th Cir.1995). Summary judgment is appropriate, when, viewing the evidence in the light most favorable to the nonmoving party, the record reflects that no genuine issue of any material fact exists, and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322-24, 106 S.Ct. 2548, 2552-53 (1986); Fed.R.Civ.P. 56(c). Once the movant carries his burden, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994).

ANALYSIS

A. The Timeliness of Messer's Lost Promotion Claims

Administrative review is normally first required before judicial review of a discrimination complaint. *See Gottlieb v. Tulane University,* 809 F.2d 278, 284 n. 8 (5th Cir.1987). A Title VII plaintiff must file a charge of discrimination with the EEOC no more than three hundred days after learning of an adverse employment decision in a referral state. *See Washington v. Patlis,* 868 F.2d

3

172, 175 (5th Cir.1989).[2]

The magistrate judge held Messer's first complaint involving the promotion of Jim Johnson, a black male, was time barred. *See Messer v. Meno,* 936 F.Supp. 1280, 1295 (W.D.Tex.1996). Johnson was named to a newly created "Coordinator" position in January, 1992, but Messer did not file an EEOC discrimination charge until November, 1994, more than 300 days after notice of the employment action of which she now complains. Messer argues her complaint for this employment action was not time-barred, however, because it was part of a continuing violation of Title VII.

The continuing violation theory relieves a plaintiff of establishing that all of the complained-of conduct occurred within the actionable period if the plaintiff can show a series of related acts, one or more of which falls within the limitations period. *See Berry v. Board of Supervisors of LSU,* 715 F.2d 971, 979 (5th Cir.1983). As this court has explained:

> The core idea [of the continuing violations theory,] however, is that [e]quitable considerations may very well require that the filing periods not begin to run until facts supportive of a Title VII charge or civil rights action are or should be apparent to a reasonably prudent person similarly situated. The focus is on what event, in fairness and logic, should have alerted the average lay person to act to protect his rights. At the same time, the mere perpetuation of the effects of time-barred discrimination does not constitute a violation of Title VII in the absence of independent actionable conduct occurring within the statutory period....

*Glass v. Petro-Tex Chem. Corp.,* 757 F.2d 1554, 1560-61 (5th Cir.1985) (quotations, citations, and footnote omitted). Thus, a plaintiff can avoid a limitations bar for an event that fails to fall within the statutory period where there is "[a] persisting and continuing system of discriminatory practices in promotion or transfer [that] produces effects that may not manifest themselves as individually

---

[2]Pursuant to Section 706(e) of Title VII, a plaintiff must file a charge of employment discrimination "within one hundred and eighty days after the alleged unlawful employment practice occurred, ... except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice, ... such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred." This court has held that "the requirement that persons aggrieved must initially institute proceedings with the state referral agency is met by the EEOC's routine transmittal of a copy of the complaint to the state referral agency." *Urrutia v. Valero Energy Corp.,* 841 F.2d 123, 125 (5th Cir.1988). Neither party *contests* that the EEOC routinely transmitted a copy of Messer's to complaint to the Texas Commission on Human Rights, the Texas referral agency, so the default limitations period is three hundred days.

discriminatory except in cumulation over a period of time" *Id.* at 1561. *See also Rendon v. AT & T Technologies,* 883 F.2d 388, 395-96 (5th Cir.1989); *Hendrix v. City of Yazoo City, Miss.,* 911 F.2d 1102, 1103-04 (5th Cir.1990); *Alldread v. City of Grenada,* 988 F.2d 1425, 1430-32 (5th Cir.1993).

In the instant case, the magistrate judge found that Messer's claim based on 1992 selection of a black male over her was time-barred because (1) the two refusals to promote of which Messer complained were discrete individual actions, not interrelated events constituting a continuing violation; and (2) Messer failed to mention racial discrimination in her 1994 EEOC complaint. *See Messer,* 936 F.Supp. 1280, 1295 (W.D.Tex.1996). The second reason is contrary to the record. Messer complained of racial discrimination and specifically mentioned Jim Johnson in supporting documentation submitted to the EEOC that expanded on her allegations of discrimination. Further, the allegations of discrimination in her EEOC complaints alluded to unspecified incidents of racial discrimination.

Whether the first reason, rejecting the continuity or relatedness of employment decisions regarding Messer, is correct is a closer question requiring further factual and legal development. The magistrate judge's offhand dismissal of Messer's assertion ignores her theory of the case, supported for summary judgment purposes with adequate evidence, that TEA systematically promoted employees based on racial and gender criteria found in the utilization reports. On the other hand, because Messer participated in this system for fourteen years before being denied the 1992 promotion, one wonders that she did not know enough to file a timely discrimination complaint These questions were not explored by the parties or the court in light of our authorities, and we leave them open on remand.

TEA also asserts that the claim based on the 1994 promotion of a white male over Messer is time-barred because it occurred more than three hundred days before Messer filed an EEOC complaint. The magistrate judge found for purposes of summary judgment that Messer had successfully raised a fact issue regarding the timeliness of her complaint. *See Messer,* 936 F.Supp.

5

at 1295-96.  Indeed she did.  TEA's failure to cite or refute the record not only waives this complaint on appeal but demonstrates the lack of evidence in the agency's favor.

B. Whether TEA discriminated against Messer.

Underlying Messer's claims are two premises:  first, that TEA published and implemented a system of racial and gender preferences in its hiring and employment decisions;  and second, that the implementation of this policy resulted in discrimination against her in the two promotion decisions and in a relatively unfavorable compensation rate compared with similarly situated minority employees.

We first consider the general charge of race-conscious employment practices.  "[A]ll racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny." *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 227, 115 S.Ct. 2097, 2113, 132 L.Ed.2d 158 (1995);  *see also City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 493-94, 109 S.Ct. 706, 721-22, 102 L.Ed.2d 854 (1989);  *Hopwood v. State of Texas,* 78 F.3d 932, 940 (5th Cir.), *cert. denied,* --- U.S. ----, 116 S.Ct. 2581, 135 L.Ed.2d 1095 (1996).  Such classifications "must serve a compelling government interest, and must be narrowly tailored to further that interest." *Adarand,* 515 U.S. at 235, 115 S.Ct. at 2117.  Although a state actor may use racial classifications when the evidence provides a strong basis for finding that it is necessary to remedy prior discrimination, *see Croson,* 488 U.S. at 500, 109 S.Ct. at 725, societal discrimination alone is not sufficient to justify a racial classification, *see Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 274, 106 S.Ct. 1842, 1847, 90 L.Ed.2d 260 (1986).  "A free people whose institutions are founded upon the doctrine of equality should tolerate no retreat from the principle that government may treat people differently because of their race only for the most compelling reasons." *Adarand,* 515 U.S. at 227, 115 S.Ct. at 2113 (citation and internal quotations omitted).  Diversity programs, no matter how well-meaning, are not constitutionally permissible absent a specific showing of prior discrimination, because " "good intentions' alone are not enough to sustain a supposedly "benign' racial classification." *Id.* at 228-29, 115 S.Ct. at 2113;  *see also Hopwood,* 78 F.3d at 945-46 (holding that

6

"the use of ethnic diversity simply to achieve racial heterogeneity, even as part of the consideration of a number of factors, is unconstitutional)."

In the instant case, the magistrate judge found that "the existence of an affirmative action plan" provides a "nondiscriminatory rationale" that rebuts any presumption of discrimination and shifts the burden to the plaintiff to show the plan is invalid. *See Messer v. Meno,* 936 F.Supp. 1280, 1293 (W.D.Tex.1996). The magistrate judge also observed that not only were the AAPs implemented at TEA not designed to correct past discrimination, but there was presently no manifest racial or sexual imbalance. He opined, nevertheless, that because "affirmative action plans are still required for all federal contractors," "past discrimination and present imbalance cannot be a requirement for constitutionality." *Id.* at 1293-94.

To the extent that the court found that racial preferences are constitutional in the absence of remedial action to counteract past provable discrimination, it erred. The Supreme Court has "insisted upon some showing of prior discrimination by the governmental unit involved before allowing limited use of racial classifications in order to remedy such discrimination." *Wygant,* 476 U.S. at 274, 106 S.Ct. at 1847; *see also Croson,* 488 U.S. at 498-99, 109 S.Ct. at 724. Further, the Supreme Court has rejected the notion that a state actor's compliance with federal mandates insulates the state from liability for discrimination. *See Miller v. Johnson,* 515 U.S. 900, 921-23, 115 S.Ct. 2475, 2491, 132 L.Ed.2d 762 (1995) (state "compliance with federal antidiscrimination laws cannot justify race-based districting where the challenged [congressional] district was not reasonably necessary under a constitutional reading and application of those laws") (emphasis added); *see also Hopwood,* 78 F.3d at 954 (the racial preference program of a local governmental unit is subject to strict scrutiny even if the unit is ordered to adopt the program).

TEA does not attempt to argue on appeal that it could constitutionally make racial preferences in hiring or promoting employees pursuant to its AAPs; rather, it argues its AAPs were confined merely to recruitment efforts, and that hiring, promotion, and compensation decisions were

7

based on merit, not race.[3]  The issue before this court is whether any of Messer's claims of discrimination involve factual issues precluding summary judgment.  As will be seen, both the scope of the AAP's and their impact on Messer's employment are subject to genuine dispute.[4]  If the trier of fact finds that the AAP's effected racial or gender considerations in employment decisions and particularly in Messer's case, then an appropriate remedy must be fashioned.

Messer's individual Title VII claims must be tested by the burden-shifting formula outlined in *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).  Following introduction of the plaintiff's prima facie case of discrimination, the employer must articulate a legitimate, non-discriminatory reason for the employment action.  *See id.* at 506-07, 113 S.Ct. at 2747.  If the employer meets this burden, the scheme of shifting burdens and presumptions

---

[3]Without conceding that TEA actively gave racial preferences, TEA does point out that the Texas Legislature in 1989 adopted a finding that TEA employed "substantially below the available minorities for one or more [occupational] categories in the total civilian labor force [and] that, historically," TEA had "not employed ... minorities in proportion to their available numbers in the civilian labor force," 1989 Tex. Sess. Law Serv. 5812 (West).  In 1991, and 1993 the Legislature re-adopted the same findings by reference, *see* 1991 Tex. Sess. Law Serv. 1041 (West);  1993 Tex. Sess. Law Serv. 5377 (West).  Such a finding does not alone constitute a compelling interest, however.  As the Supreme Court observed in *Croson,* "Racial classifications are suspect, and that means that simple legislative assurances of good intention cannot suffice." *Croson,* 488 U.S. at 500, 109 S.Ct. at 725.  Moreover, the effect of *Croson* was to "unequivocally restrict[ ] the proper scope of the remedial interest to the state actor that had previously discriminated." *Hopwood,* 78 F.3d at 954.  TEA points to no evidence that would show the agency has discriminated on the basis of race or sex other than in the pursuit of implementing its AAP.

[4]We note that TEA AAPs in the record through 1995 continued to state as part of the "Goals for the Texas Education Agency":

> The overall goal of the Texas Education Agency, therefore, is to have a staff that reflects the ethnic composition of the Texas population.

| 1990 Census | |
| --- | --- |
| Male | 49.3 |
| Female | 50.7 |
| White | 60.3 |
| Black | 11.9 |
| Hispanic | 25.5 |
| Other | 2.3 |

The combination of this language and U.S. Census statistics obviously raises concern that the AAP on its face mandates an unconstitutional quota system.

"simply drops out of the picture," and "the trier of fact proceeds to decide the ultimate question: whether plaintiff has proved "that the defendant intentionally discriminated against [him] because of his race.' " *Id.* at 511, 113 S.Ct. at 2749 (internal citation omitted).

The magistrate judge found, and we agree, that in each of the five instances of discrimination remaining after the 1992 promotion claim had been dismissed, TEA produced a legitimate, non-discriminatory reason for its decision. Monroe, to begin with, was allegedly recommended over Messer by an interview panel because he scored the highest in objective questioning. *See Messer,* 936 F.Supp. at 1296. Additionally, Monroe's qualifications were "more than adequate" for the position to which he was promoted. *Id.* As for the four minority directors who were higher paid than Messer, the court found that "even viewed in the light most favorable to the Plaintiff, these directors were qualified for their positions." *Id.* TEA argued that the directors were hired to work for a higher compensation rate than Messer because they were " "lure[d]' " from outside the agency and in three cases, came to TEA with a significant reduction in salary. The court deemed this a credible, non-discriminatory reason for the pay difference and dismissed all of these claims because it found that Messer's evidence failed to show that TEA's proffered reasons for these decisions were pretextual. *Id.*

In his conclusion on pretext, however, the magistrate judge arbitrarily discounted Messer's evidence that the AAP was vigorously enforced to ensure that TEA's workforce would resemble as closely as possible the state's racial and gender breakdown. Messer cites many portions of the record to substantiate the discriminatory impact of TEA's affirmative action policy. Among the evidence is the following:

> 1. From 1989-1994, TEA AAP's stated as their purpose: "The overall objective of this plan is to achieve a workforce balanced with a proportionate number of minorities and women in the population. This balance is to be realized in all levels of responsibility within the Agency." (*See, e.g.,* R. at 00885.) In the 1995 AAP, the phrase "in the population" was replaced with "in the workforce," (R. at 02168), but the part of the AAP articulation of the "Goals for the Texas Education Agency" retained the following language from 1989-95: "The overall goal of the Texas Education Agency ... is to have a staff that reflects the ethnic composition of the Texas population." (*See, e.g.,* R. at 00892, R. at 02175.)

> 2. In a November 11, 1993 letter from Commissioner Meno entitled "Report on

Ethnic/Gender Distribution of Texas Education Agency Personnel," Commissioner Meno wrote that TEA "continues to implement the goal of the State Board of Education to achieve a staff balanced both in ethnicity and gender and reflecting as nearly as possible the ethnic composition of the state as a whole." The letter also listed a breakdown of the number and type of minorities hired for the previous year. (R. at 01193.)

3. A November 5, 1991 letter from the Division Director of the Division of Personnel and Staff Development to the Agency Hiring Managers states: "In specific response to the Governor's goal for a balanced workforce, the Agency reiterated the State Board of Education's existing goal to "ensure that the Agency's hiring and promotion practices produce a workforce that reflects the ethnic and gender diversity of the state's population.' " The letter also stated: "An EEO/AA utilization report will be provided to each division director indicating utilization of the protected classes. If an underutilization exists in a particular protected class, every available means will be taken to eliminate this underutilization." The letter ended by encouraging the Hiring Managers to refer to certain affirmative action related materials "frequently in your staff recruitment efforts and hiring decisions." (R. at 01432) (emphasis added.)

4. Submitted with the November 5, 1991 letter were the Recruitment and Hiring Guidelines, which stated at the beginning: "Managers should survey their staffing patterns, especially concerning race and sex, when vacancies occur. While persons must ultimately be employed on the basis of job-related criteria, the needs of the unit, which include balanced workforce considerations, should have significant influence on employment decisions.... Remember, it is not required that the most qualified applicant be hired, *only that the person hired meet the minimum qualifications set for the position."* The Guidelines urged a "rational basis" for recommending an applicant not as qualified as others, but warned that "[c]redible reasons for your recommendation become absolutely critical if the person recommended belongs to an over-utilized race and/or gender." (R. at 01433-35) (emphasis added.)

5. A letter from the Division of Human Resources to Linda Cimusz, Messer's supervisor from January through August 1992, compares a breakdown of departmental staffing statistics with the general work force, and instructing: "Please request the ethnicity/gender list of applicants for your position once the posting dates have expired *or you are preparing to make a selection.* This will enable you to review pertinent job factors with ethnicity/gender applicants." (R. at 1649-50) (emphasis added.)

6. A 1991 letter from Larry D. Loiselle, former TEA Equal Opportunity Coordinator, and Sophie Reeder stated that the "Chairperson for the SBOE Personnel Subcommittee, has further placed pressure on Personnel to hire Hispanics due to the Hispanic population increasing as a percentage of the total population of the State." The letter recommended Pete Garcia, an Hispanic applicant, for a certain position, but noted "controversy from concerned, high level black employees," and added as a second option: "Hire Peter Garcia to manage the compensation and benefits section.... We could hire a black employee much more easily as a Position Classification Analyst position, level 17." (R. at 01713-14.)

7. TEA AAP "Under-utilization Notices" (which provided a breakdown of positions and the races of the applicants, and a breakdown of employment transactions (hiring, firing, promotion, etc.) and the races of the affected employees) were issued each time a job vacancy opened. For instance, in August 1993 TEA processed 29 job vacancy notices and 29 AAP Under-utilization notices, (R. at 01618), while in April 1994, TEA processed 30 job vacancy notices and 30 AAP Under-utilization notices, (R. at 01628.)

8. A flurry of handwritten notes from TEA employees regarding job vacancies contain statements such as "Meets Parity in the employment of females but needs 2 minorities to meet parity," (R. at 01588), or "The Dept. For Finance needs 3 minorities to meet Parity in employment in Job Group Category "G,' which includes Accounting Clerk III, [sic] Accordingly, a letter regarding underutilization is required. They meet Parity in the employment of females in Cited Category." (R. at 01510.) Messer contends these letters indicate that individuals not in the desired category were discriminated against through the application of the AAP.

9. Immediately prior to resigning, Messer was directed by a January 8, 1996 AAP Under-utilization report to hire a Hispanic in her division.[5]

Such evidence, if uncontradicted, strongly suggests recruitment was not the sole activity affected by the AAP, and that once an applicant met the minimum requirements for a position, TEA employees considered race or gender in employment decisions. The magistrate judge himself found that "there is evidence that in the past, race and gender were a factor in selection of the successful applicant."[6] *Messer,* 936 F.Supp. at 1294.

TEA's response to this evidence, apart from creating a fact issue on the precise application of the AAPs in employment decisions, is that even if there were some incidents of past discrimination, these were isolated anomalies and cannot be related to the individual harm of which Messer

---

[5]Messer's allegation is substantially supported by a memorandum in the record (regarding a job vacancy notice) that was forwarded to Bill Monroe and Karen Messer from TEA's Division of Human Resources. The memorandum, which was dated January 8, 1996, states in part: "The State Board of Education has recently reaffirmed its goal for the Agency to employ minorities and women as close to the ethnic composition of the State as a whole. Additionally, the [AAP] identifies deficiencies in staffing and the need for hiring qualified minorities and women by EEO-4 categories.... [T]he following are deficiencies in State Board and Work Force staffing." Following a breakdown of minorities compared to the general population and the workforce which listed Hispanics as the only specifically identified minority race in deficiency, the memorandum went on to state: "Please request the ethnicity/gender list of applicants for your position once the posting dates have expired *or you are preparing to make a selection.* This will enable you to review pertinent job factors with ethnicity/gender applicants." (R. at 02643) (emphasis added.)

[6]The court also found that "there is no evidence that such is still the case at the present." The court cited no portion of the record or evidence for this finding, however, and instead noted in a footnote to the assertion above: "Given that affirmative action has succeeded at this agency, the Court surmises that, under *Hopwood* and using strict scrutiny, any future use of race or gender as a factor in an actual hiring decision would be unconstitutional." The court's finding that discrimination had ceased, thus, was apparently mere speculation on the prospective effect of this court's decision in *Hopwood v. State of Texas,* 78 F.3d 932 (5th Cir.), *cert. denied,* --- U.S. ----, 116 S.Ct. 2581, 135 L.Ed.2d 1095 (1996).

complains. The abundant evidence of underutilization notices, statements regarding affirmative action and minority hiring from the Division of Personnel and Staff Development, handwritten notes with TEA letterhead regarding the "parity" of various groups in hiring decisions, and correspondence from Commissioner Meno stating that TEA "continues to implement the goal of the State Board of Education to achieve a staff balanced both in ethnicity and gender and reflecting as nearly as possible the ethnic composition of the state as a whole," appear to depict an agency-wide consciousness of race and gender as grounds for employment decisions. At the very least, Messer has raised a material factual issue regarding whether she was discriminated against as a result of TEA's AAP in the specific instances of which she complains. The magistrate judge erred in finding that Messer failed to produce "any facts" that would show TEA's explanations for its personnel decisions regarding her were pretext for discrimination.

Messer also sought prospective injunctive relief and reinstatement with TEA. The magistrate judge found that Messer requested reinstatement only if she were to be promoted, and that Messer was not entitled to this promotion; thus, the court held any prospective relief was moot. *Messer,* 936 F.Supp. at 1293. Messer points out, however, that her First Amended Complaint sought injunctive relief *including,* but not limited, to a promotion or a salary at the level of the four minority directors hired to positions similar to the one she held, or "any other equitable relief as the Court deems appropriate." Jurisdiction over claims for prospective relief "is appropriate only if a reasonable likelihood exists that the *plaintiff* will again be subjected to the allegedly unconstitutional actions." *Wallace v. Texas Tech Univ.,* 80 F.3d 1042, 1047 n. 3 (5th Cir.1996). This determination in turn depends on whether Messer can show she was discriminated against; thus, our remand of Messer's other claims necessarily calls into question whether she was entitled to a promotion or some other form of injunctive relief. On remand, should Messer successfully prove that she was discriminated against, the magistrate judge may then determine what remedies Messer is entitled to, prospective or otherwise.

Messer also argues the magistrate judge erred in dismissing her complaint that TEA retaliated

against her for filing a discrimination charge. In order to support a retaliation claim under Title VII, Messer had the burden of establishing that: (1) she engaged in activity protected by Title VII; (2) an adverse employment action occurred; and (3) there was a causal connection between the participation in the protected activity and the adverse employment action. *See Dollis v. Rubin,* 77 F.3d 777, 781 (5th Cir.1995). Furthermore, "Title VII was designed to address ultimate employment decisions, not to address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions." *Id.* at 781-82. Ultimate employment decisions include hiring, discharging, promoting, compensating, or granting leave, but not "events such as disciplinary filings, supervisor's reprimands, and even poor performance by the employee—anything which *might* jeopardize employment in the future." *Mattern v. Eastman Kodak Co.,* 104 F.3d 702, 707-08 (5th Cir.1997).

On review, we agree that none of Messer's allegations of retaliation involves adverse personnel action. Although Messer alleged in the magistrate judge that TEA failed to resolve her internal grievance, closely monitored her conversations, criticized her work and conduct, did not listen to her input or allow her to represent TEA at certain functions, and downsized her department (as part of an agency-wide reduction), she did not allege an ultimate employment decision. On appeal, Messer asserts retaliation by TEA against other employees who criticized affirmative action or gave testimony in her lawsuit; this is not probative as to Messer. At best, Messer's allegations concern incidents that "might jeopardize employment in the future," but did not affect her in any ultimate sense.

## CONCLUSION

For these reasons, the decision of the magistrate judge dismissing Messer's discrimination claims is REVERSED and REMANDED in part and AFFIRMED as regards the retaliation claim.

AFFIRMED IN PART; REVERSED and REMANDED IN PART.

REYNALDO G. GARZA, Circuit Judge, specially concurring:

I concur with the result reached by the majority in this matter. Messer's retaliation claim was

properly dismissed, but the magistrate judge erred in dismissing Messer's discrimination claims. Therefore, this case is reversed and remanded in part and affirmed in part. However, I have certain reservations about the decision of the majority, and write separately to express those concerns.

Our fellow Circuit Judge, Judge Jacques Wiener, reminded us in his concurrence in *Hopwood v. State of Texas* that "we should only decide the case before us, and should do so on the narrowest possible basis." *Hopwood v. State of Texas,* 78 F.3d 932, 962 (5th Cir.1996) (Wiener, J. concurring), *cert. denied,* --- U.S. ----, 116 S.Ct. 2581, 135 L.Ed.2d 1095 (1996). The majority is attempting to prove a bit too much in this case, with its rather sweeping dicta regarding the constitutionality and standards of review for affirmative action policies. In doing so, it appears to me that the majority is attempting to quietly expand *Hopwood's* empire into the realm of employment law with this decision, a move which is bo th hasty and unnecessary, given that the main issue is simply whether there is enough of a disput e of fact and law in this matter so as to preclude summary judgment. I am not persuaded that Supreme Court precedent or the precedent of this Circuit requires as sharp an assault on state affirmative action employment policies as the majority implies, nor do I see a particular need to add yet another burden to those who are trying to manage workplaces in this Circuit.

The majority appropriately cites *Wygant, Croson, and Adarand* as the three leading Supreme Court cases on this subject. *Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986); *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989); *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995). As these cases point out, the racial classifications imposed by government must be reviewed under strict scrutiny, such classifications "must serve a compelling government interest, and must be narrowly tailored to further that interest." *Adarand,* 515 U.S. at 227, 235, 115 S.Ct. at 2112-13, 2116-17. Racial classifications whose sole purpose is the creation or maintenance of diversity do not pass muster under this standard. *Id.* at 228, 115 S.Ct. at 2113. Similarly, affirmative action programs whose sole or primary purpose is the creation of minority "role models" do not pass muster under this standard. *Wygant,* 476 U.S. at 275, 106 S.Ct. at 1847-48. However, this strict

14

scrutiny does not abolish all race-based distinctions, and such distinctions are acceptable if necessary to further a compelling interest, and if the "narrow tailoring" test is satisfied. *Adarand,* 515 U.S. at 237, 115 S.Ct. at 2117. As Justice O'Connor stated, strict scrutiny is not "strict in theory, but fatal in fact." *Id.* Further, it should be noted that this case does not involve strict quotas (or quotas masked as "goals") as did *Adarand* and *Croson.*

Whether or not the TEA's policies pass muster is a matter to be decided upon remand. However, I fear that the tone of the majority's decision, coupled with its invocation of *Hopwood,* will send the message out that affirmative action is, for all intents and purposes, dead in the Fifth Circuit. Such an interpretation would be incorrect under Supreme Court precedent and the precedent of this Circuit, and I write separately to make that point clear.

During the course of our deliberations, I asked my fellow judges on this panel to wait until the Supreme Court made its decision in *Piscataway* before publishing an opinion in this case. *Taxman v. Bd. of Educ. of Township of Piscataway,* 91 F.3d 1547 (3d Cir.1996), *cert. granted,* --- U.S. ----, 117 S.Ct. 2506, 138 L.Ed.2d 1010 (1997). My colleagues chose not to do so, and I disagreed with this choice.

Today, as I write this concurrence, the latest news from Washington states that *Piscataway* is going to be settled. This does not change my disagreement with the majority's choice, in principle. While it is true that the basic facts of *Piscataway* differed from those of the case at bar, the basic issues were similar, namely, the extent to which, if at all, race and ethnicity may be considered in employment decisions made by the government. When *Piscataway* was still a live case, I thought my colleagues should have chosen to wait, so this Circuit would not only have had the benefit of the most current views of the Supreme Court on this subject, but we could also have used this case to help chart the post-*Piscataway* course in this field of law. I believe that this haste was unnecessary (Messer is at a new job, so we need not be concerned that she is suffering at the hands of hostile employers), and indicative of the majority's desire to move quickly and quietly in expanding *Hopwood's* reach. At any rate, recent events make this point moot as a legal matter, but I think it is

15

still worth commenting upon.

There is another issue regarding Supreme Court precedent.  In recent years, the Supreme Court has been showing a stronger (and in my view, salutary) respect for states' rights.  The Supreme Court, in decisions such as *U.S. v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995),[1] *Printz v. U.S.,* --- U.S. ----, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997),[2] *City of Boerne v. Flores,* --- U.S. ----, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997),[3] and *Washington v. Glucksberg,* --- U.S. ----, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997),[4] among others,[5] has shown an increasing willingness to limit the power of the federal government and allow states to set their own rules and regulations on various matters.

This development has coincided with the Supreme Court's limitations on affirmative action, as exemplified in *Wygant, Croson,* and *Adarand.*  These two trends, while independent, can conflict with one another.  If a state, through the acts of its legislature, chooses to create certain affirmative action policies, the extent to which the federal courts can interpret and scrutinize such policies is both expanded by the recent precedents limiting affirmative action and contracted by the recent precedents

---

[1]In *Lopez,* the Supreme Court struck down the federal Gun-Free School Zones Act, which forbade the possession of a handgun within a school zone, stating that passage of this law exceeded Congress' authority under the Commerce Clause, because the activity in question was not economic activity that substantially affected interstate commerce, and therefore, passage of this law was an unconstitutional overreach on the part of the Congress.

[2]In *Printz,* the Supreme Court struck down a section in a federal handgun control law, the Brady Law, which required local law enforcement agencies to perform background checks on gun purchasers.  The Supreme Court held this requirement imposed an unconstitutional obligation on state and local law enforcement authorities to execute federal laws.

[3]In *Boerne,* the Supreme Court struck down the federal Religious Freedom Restoration Act of 1993, as exceeding Congress' enforcement powers under § 5 of the Fourteenth Amendment, and constituted an unconstitutional interference with state and local regulations regarding zoning, health and safety, and other police power matters.

[4]In *Glucksberg,* the Supreme Court did not create a right to die, but also did not forbid states from passing laws regarding assisted suicide, thereby leaving the issue of the right to die up to the states, unlike the issue of the right to abortion.  *See Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

[5]Admittedly, the cases cited do not deal with affirmative action, but they are useful in demonstrating the federalist trend in Supreme Court jurisprudence.

limiting the power of the federal government (including the federal courts) from intervening in matters of state governance.

This federalist trend conflicts with an interventionist posture by the federal courts with regard to state affirmative action policies. This conflict has yet to be resolved, and I fear that an overly intrusive approach on our part will only confuse an already murky situation. Indeed, the Supreme Court's decision to deny certiorari in *Coalition for Economic Equity v. Wilson,* 110 F.3d 1431 (9th Cir.1996), *cert. denied,* --- U.S. ----, 118 S.Ct. 397, --- L.Ed.2d ----,[6] can be interpreted (to the extent that denials of certiorari can be interpreted) as a recognition that the Supreme Court is reluctant to create a national, "one size fits all" regulation on affirmative action, and is content to leave the details up to the states.

The policies at issue in the case at bar are based on decisions by the legislature, in its findings and regulations regarding the use of affirmative action policies in employment. These regulations, promulgated by a democratically elected legislature, deserve at least some degree of deference and respect.[7] I am concerned that the majority does not seem to give this point much thought in its analysis, and does not give enough respect to actions which were based on the decisions of the legislature. I am of the opinion that unless a state's actions are forbidden by restrictions in the text of the Constitution or the overwhelming weight of case law, the federal courts should not meddle into the internal affairs of the states. That is one of the main ideas underlying the Tenth Amendment, and the very nature of our federal system.

However, despite my reservations, I CONCUR with the decision of the panel in this case. Karen Messer will have her day in court.

---

[6]In this case, the Ninth Circuit held that Proposition 209, an anti-affirmative action referendum passed by a majority of the voters in California, did not violate the equal protection clause, and was not preempted by Title VII. The Supreme Court denied certiorari.

[7]Further, the policies in question, however controversial, certainly do not deserve to be compared to the racial laws of Nazi Germany, as was done in a rather ridiculous paragraph in Messer's brief.

17