# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00450-CV

**Aman Attieh, Appellant**

**v.**

**University of Texas at Austin, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT
## NO. GN104059, HONORABLE PATRICK O. KEEL, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant, Aman Attieh, appeals the trial court's grant of summary judgment in favor of appellee, University of Texas at Austin (the University). Attieh claims that her position as Senior Lecturer was eliminated and that she was prevented from interviewing for a newly created Associate Professor position in retaliation for complaints that she and others made regarding the allegedly disparate treatment of herself and the Arabic language program by the University and its representatives. Attieh also contends that the University violated the Texas Equal Pay statute. The University avers that Attieh failed to make out a prima facie case on either of her claims and, consequently, summary judgment was appropriate. Because we agree with the University, we affirm the trial court's judgment.

# BACKGROUND

Attieh moved to America from Lebanon in 1972 to pursue a doctorate in education at the University. Dr. Peter Abboud was one of Attieh's professors and served on her dissertation committee. Attieh received her Ph.D. in 1978. That year she taught a series of courses at the University and continued to do so until she moved to Saudi Arabia in the early 1980s. In 1984, Attieh returned to the University as a lecturer specializing in the Arabic language. Her employment at the University was subject to renewal annually and her position was not eligible for tenure.

Over the years, Attieh and Abboud developed strong personal and professional bonds. In addition to their work at the University, they also taught at the Middlebury Summer Language Program in Vermont each summer from 1984 to 1990.

In 1994, the University created the Department of Middle Eastern Languages and Cultures (the Department). The Department included the Arabic, Hebrew, Persian, and Turkish language programs, as well as the Islamic and Jewish Studies programs. Abboud was appointed Chair of the Department. While Chair, Abboud made Attieh chair of the Course and Curriculum Committee, coordinator of the Arabic language program, and undergraduate advisor—even though the positions were usually reserved for tenured faculty. Abboud also gave Attieh the largest office of anyone in the Department, including himself. Additionally, Attieh was promoted to Senior Lecturer during this time. Her new position remained subject to renewal annually and was not eligible for tenure.

In the Spring of 1998, the Dean of the College of Liberal Arts (the Dean) formed a committee and charged it with investigating alleged problems within the Department. The

2

committee issued its report in April 1998 and found that (1) the Department would benefit from a change in leadership; (2) there has been a lack of cooperation with the Center for Middle Eastern Studies by the current Chair, Abboud, and some of the faculty members; (3) an outside review team should evaluate the merit of the Arabic program's current policies, paying particular attention to problems with student retention and attrition, student dissatisfaction and complaints, and inadequate communication with other programs; and (4) the new Chair must have the authority to appoint a new coordinator of the Arabic language program.  The committee also found that:

> Senior Lecturers in supervisory roles over tenured and tenure-track faculty is problematic and undesirable.  The complaints voiced by [Department] faculty about the role of the Senior Lecturer . . . have to do with the multiple committee appointments and administrative responsibilities made available to her by the Chair [Abboud] as well as the extraordinary *unofficial* influence that the Chair has allowed her to exercise in the running of the Department over the past four years.  This irregular situation, which disregarded proper professional consideration of rank, equitable distribution of service opportunities among faculty, and good form, has had unhealthy effects on the functioning and morale of the Department.

(Emphasis in original.)

Immediately after the report was issued, Dr. Harold Liebowitz was appointed Chair of the Department, replacing Abboud.  Liebowitz is Jewish and teaches Hebrew.  Soon after his appointment, Liebowitz met with Attieh to discuss complaints regarding her teaching style and methodology.  Liebowitz outlined the areas in which Attieh should improve and also told her that there had been allegations that she verbally abused her students.  Attieh claims Liebowitz threatened her with loss of her job if she did not change her methods.  Attieh complained to the Dean and the

head of the University's grievance committee about the meeting, the alleged threat, and what she perceived to be an attack on her academic freedom.

In addition, Liebowitz requested that Attieh give up her large office so he could use it as the Chair's office. Attieh objected, asserting that this action would break up the "Arabic enclave," four adjacent offices that housed the Arabic language faculty and language lab. She explained that students and faculty had agreed only to speak Arabic in this area and that Liebowitz's presence would disrupt this practice and undermine the total immersion instructional method employed by the Arabic language faculty. She argued further that she needed the larger office in order to fulfill her duties as language coordinator. Ultimately, Attieh remained in the office and Liebowitz moved into Abboud's former office.

Shortly after his appointment as Chair, a student alleged that Liebowitz made a racist remark about Palestinian Arabs while leading an archaeological dig in Israel. Liebowitz adamantly denied having made the remark. Soon after this allegation, the Dean received a letter from Mark Sullivan, a graduate student in Arabic literature, in which Sullivan expressed his concerns regarding (1) the appointment of Liebowitz as Chair and the composition of the committee that appointed him; (2) the perceived marginalization of the Arabic language program; (3) the need for tenure-track positions for the Arabic program, especially for Attieh; (4) the lack of positions for Arabic program faculty on Departmental committees; (5) the fact that Arabic language students received a disproportionately lower number of Foreign Language Area Studies fellowships; (6) the perception that the Arabic program is losing faculty due to the tension within the Department; (7) the failure to mention the Arabic program in the Departmental newsletter; and (8) the racist remark allegedly made

4

by Liebowitz.  The following month Liebowitz met with a student organization, the "Coalition of Concerned Graduate Students," to address and attempt to alleviate student concerns regarding the state of affairs in the Department.

In late November 1998, Liebowitz called an emergency meeting to address the "political issues" facing the Department.  He stated that the "ongoing, debilitating, obstructionist, and uncouth behavior on the part of three individuals" must end.[1]  He further asserted his belief that the student complaints pertaining to the marginalization of the Arabic program and accusations that he is a racist were formulated with the input of certain faculty members and designed to harass and vilify the Chair.  Dr. Michael Hillman, a Professor of Persian Studies, attended the meeting and claims that Liebowitz verbally attacked Attieh and that she left in tears.  Hillman further stated that after the meeting he and several other faculty members requested an outside review of the Arabic language program.

In December 1998, Liebowitz met with the Dean to discuss the departmental unrest. The Dean proposed an outside review of the entire Department.  After the meeting, Liebowitz wrote a letter to the Dean that set forth the costs and benefits of an outside review.  Liebowitz argued that the review would be useless unless the reviewers have the ability to implement corrective measures based on a thorough exploration of the entire Department.  He noted that if the review resulted in upgrading the Senior Lecturer position to a tenured or tenure-track position and Attieh is not hired the University could expect a lawsuit.  He also noted that the review process itself would be

---

[1] Based on the record, we presume that Liebowitz was referring to Abboud, Attieh, and Dr. Michael Hillman.

5

disruptive, especially in light of his belief that certain faculty had already demonstrated a willingness to incite students into raising "bogus and gratuitous issues" and "playing the race card."

In the fall of 1999, Liebowitz requested an additional teaching position for the Arabic language program. His request was approved on the condition that the new hire would come in as a tenured Associate Professor. The Dean believed that this was necessary to ensure that the new faculty member would be independent and not fearful of losing his or her job. Initially, Liebowitz thought that the new professorship would be an additional position, but he soon learned that it would replace the Senior Lecturer position, thereby eliminating Attieh's job. Attieh applied for the tenured position, but was not selected for an interview. Abboud complained, suggesting that the posted job description was tailored to impair Attieh's chances of selection, that the composition of the committee was unfair, and that Attieh at least should have been granted an interview. Ultimately, Dr. Mohammed Mohammed, a Palestinian Arab, was hired for the new position.

On April 7, 2000, Attieh complained to the University's Equal Employment Opportunity Office, alleging that she was denied the opportunity to interview for the new position because of her "gender, race, and/or national origin." In July 2000, Attieh filed a discrimination charge with Texas Commission on Human Rights complaining of gender and national-origin discrimination, retaliation, and violations of the Equal Pay Act.

Although Attieh's position was eliminated, she was allowed to return to the University for the 2000-01 academic year so that she could teach second-year Arabic to her previous first-year students and so she could have time to search for future employment. During this year,

Attieh was not on the Department payroll.[2] Additionally, her office was moved to another building. After leaving the University in 2001, Attieh was hired as a Senior Lecturer by Rice University.

The University filed a traditional motion for summary judgment arguing that Attieh had failed to establish a prima facie case on each of her claims. The district court granted the University's summary-judgment motion, without explanation. This appeal followed.

## STANDARD OF REVIEW

We review the district court's grant of summary judgment *de novo*. *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 156 (Tex. 2004). When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548-49 (Tex. 1985). A defendant who moves for summary judgment under Rule 166a(c), as here, is entitled to have its motion granted if it conclusively negates at least one of the essential elements of the plaintiff's cause of action or if it conclusively proves each element of its affirmative defense, thereby showing that it, as the movant, is entitled to judgment as a matter of law and no genuine issues of material fact remain. *Rhone-Poulenc*, *Inc. v. Steel*, 997 S.W.2d 217, 222-23 (Tex. 1999). Only if the defendant meets its burden does the burden shift to the plaintiff, as the nonmovant, to establish that a genuine issue of material fact remains. Tex. R. Civ. P. 166a(c). If the trial court does not specify the grounds upon which the summary judgment was granted, as here, the judgment can

---

[2] Attieh was paid as if she was a member of the Dean's staff.

be affirmed on any meritorious argument that was advanced in the pleadings. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001).

## DISCUSSION

In two issues on appeal, Attieh claims that genuine issues of material fact remain as to whether she established a prima facie case on her retaliation and equal pay claims. We will address each issue in turn.

**Retaliation**

In order to establish a prima facie case of retaliation, Attieh must prove that (1) she engaged in a protected activity; (2) the University took some unlawful employment action against her; and (3) the University's unlawful employment action was due to her engagement in the protected activity. *Mayberry v. Texas Dep't of Agric.*, 948 S.W.2d 312, 315 (Tex. App.—Austin 1997, pet. denied).[3] The labor code sets forth four broad categories of protected activities. Section 21.055 provides that an employer commits an unlawful employment practice if the employer retaliates or discriminates against a person who: (1) opposes a discriminatory practice; (2) makes or files a charge; (3) files a complaint; or (4) testifies, assists, or participates in any manner in an investigation, proceeding, or hearing. Tex. Lab. Code Ann. § 21.055 (West 1996). The University

---

[3] In Texas, protection against employment discrimination is statutorily provided by chapter 21 of the labor code. An express purpose of labor code chapter 21 is to "provide for the execution of the policies of Title VII of the Civil Rights Act of 1964 and its subsequent amendments." Tex. Lab. Code Ann. § 21.001(1) (West 1996). Therefore, if necessary we look to analogous federal statutes and the cases interpreting them when construing chapter 21. *See Wal-Mart, Inc. v. Canchola*, 121 S.W.3d 735, 739 (Tex. 2003); *see also Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 476 (Tex. 2001).

contends that even when evidence in Attieh's favor is taken as true and all inferences are indulged in her favor, Attieh cannot establish that she engaged in a protected activity. We agree.

Attieh claims that her position was eliminated and that she was prevented from interviewing for the new Associate Professor position in retaliation for complaints that she and others made regarding the allegedly disparate treatment of herself and the Arabic program by Liebowitz. After Liebowitz was appointed Chair of the Department Attieh, Abboud, and various students complained, in letters and at meetings, about what they perceived to be the marginalization of the Arabic language program. Attieh made various complaints about (1) the reduction in resources for the Arabic language program and the effect of these reductions on the future quality of the program, (2) the level of funding for the program, (3) Liebowitz's attacks on her teaching methods, (4) possible infringement on her academic freedom, and (5) accusations that she verbally abused her students and teaching assistants. However, Attieh never directly or indirectly voiced an opinion as to whether the alleged disparate treatment of her and the Arabic language program was based on race or national origin until her April 7, 2000 letter to the University's Equal Employment Office.[4] Nevertheless, Attieh argues that when viewed in light of a long history of tension within the Department between Jewish and Arabic faculty members, geopolitical history involving Jews and Palestinian Arabs, and considering that Liebowitz, a Jew, allegedly made a disparaging remark about Palestinian Arabs, her complaints constituted protected activity because they were constructively complaints about discrimination.

---

[4] Both Attieh and the University agree that Attieh's April 7, 2000 letter to the University's Equal Employment Office was a protected activity.

9

While we are to indulge all reasonable inferences in Attieh's favor, it would be inappropriate for us to accept Attieh's characterization of the global relationship between Jews and Arabs as evidence of the motivation for every administrative decision in the Department. The evidence Attieh cites as proof of this contention simply does not support the inference that an ethnicity-based conflict motivated the administrative changes. At best, Attieh's complaints concern discrimination against the Arabic language program, not discrimination against her based on her race or national origin. Additionally, the allegation that Liebowitz made a racist remark or complained that certain faculty members of the Arabic language program had incited students into playing the "race card" is not evidence that transforms Attieh's complaints about administrative decisions into complaints about discrimination. In complaining about the changes under the new Chair, Attieh never mentioned race or national origin. Therefore, Attieh did not put the University on notice that she was complaining about unlawful discrimination, as opposed to administrative decisions. Consequently, her complaints about changes in the Department do not constitute a protected activity. *See Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1313 (6th Cir. 1989) (holding vague charge of discrimination in internal letter or memorandum is insufficient to constitute opposition to an unlawful employment practice); *see also EEOC v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1012-13 (9th Cir. 1983) (if statement does not mention specific act of discrimination, employer must be able to discern from context of statement that employee opposes allegedly unlawful employment practice); *Azubuike v. Fiesta Mart, Inc.*, 970 S.W.2d 60, 65 (Tex. App.—Houston [14th Dist.] 1998, no pet.) (vague charges of discrimination do not invoke statutory protection).

10

Attieh also avers that the complaints made by Abboud and various students can be used to establish that she engaged in a protected activity. The plain language of labor code section 21.055 prohibits retaliation against a *person who* opposes a discriminatory practice. Thus, in order for Attieh to establish that she engaged in a protected activity she must prove that *she* opposed the University's allegedly discriminatory practices, not that third parties did. The fact that others also complained provides no evidence that Attieh engaged in a protected activity.

Liebowitz requested that faculty members talk to their students to dispel the inflammatory racial allegations regarding him. Attieh suggests that her decision to do nothing in response to this request constituted "passive opposition" to a discriminatory practice. Essentially, Attieh is arguing that she perceived Liebowitz's request to be discriminatory but fails to explain why. Liebowitz did not tell the faculty to silence the students' protests; he only requested that they explain to their students that he denied making the alleged disparaging remark and that the protests were damaging to the Department. Furthermore, Liebowitz did not mandate that faculty members talk to their students; he merely pointed out that it was in the Department's best interest that the infighting cease. We cannot conclude that Liebowitz's request constituted a discriminatory practice, or that Attieh's inaction constituted passive opposition to discrimination.

Even if we were to conclude that Liebowitz's request was discriminatory, Attieh's inaction would not have put either Liebowitz or the University on notice that she was opposing the allegedly discriminatory practice. Liebowitz's request was not directed solely at Attieh. Consequently, it is possible that some faculty members spoke to their students while others did not. There is no evidence in the record indicating that Liebowitz attempted to determine which, if any,

11

of the faculty had spoken to their students. Attieh does not contend that either Liebowitz or the University was aware of her decision not to talk to her students. In order for an employer to retaliate against an employee for engaging in a protected activity, such as opposing a discriminatory practice, the employer must actually know that the employee engaged in the protected activity. *See* Tex. Lab. Code Ann. § 21.055. Here, there is no evidence that the University knew that Attieh was passively opposing what she perceived to be a discriminatory practice. Therefore, the University could not have retaliated against her for this behavior.

We hold that Attieh has not raised a question of material fact as to whether she actually engaged in a protected activity prior to her letter to the University's Equal Opportunity Office on April 7, 2000, which was after the alleged retaliatory actions had been taken.

Nevertheless, Attieh argues that she was retaliated against because the University either perceived that she had engaged in a protected activity, or anticipated that she would do so. She insists that if we find a question of material fact as to either of these theories then the grant of summary judgment was in error.

But as we discussed above, labor code section 21.055 prohibits an employer from retaliating against an employee *who* engages in a protected activity. *Id.*; *Mayberry*, 948 S.W.2d at 315. Consequently, a prima facie case is not established if the employee cannot demonstrate that she actually engaged in a protected activity. *Mayberry*, 948 S.W.2d at 315. Attieh insists that we must liberally construe remedial statutes, such as the anti-retaliation statute, and that the purpose of the statute is not served by strictly adhering to the plain language. *See Dennis v. Higgins*, 498 U.S. 439, 443 (1991). Furthermore, she cites *Fogelman v. Mercy Hospital, Inc.*, 283 F.3d 561, 571-72 (3rd

Cir. 1996), which holds that an employer's discharge of an employee for discriminatory reasons amounts to illegal retaliation even if it is based on the employer's mistaken perception that the employee engaged in a protected activity.

The language of the anti-retaliation statute at issue in *Fogelman* differs significantly from the Texas statute. *Compare* 42 U.S.C. § 12203(a) *with* Tex. Lab. Code Ann. § 21.055. The *Fogelman* court held that the focus of the federal statute was on the employer's subjective reasons for retaliating against an employee. *Fogelman*, 283 F.3d at 571. Hence, the court held that it did not matter whether the "reasons behind the employer's discriminatory animus are actually correct as a factual matter." *Id*. Thus, under the third circuit's construction of the federal statute, it is not necessary that an employee actually engage in a protected activity. However, the plain language of the Texas statute protects active participation in a protected activity. Our sister court in Waco has rejected Attieh's suggestion that an employer's perception that an employee engaged in a protected activity is a sufficient ground for a retaliation claim. *See Salay v. Baylor University*, 115 S.W.3d 625, 627 (Tex. App.—Waco 2003, pet. denied) ("Applying *Fogelman* . . . would effectively discount the plain words of the statute requiring active participation, interpreting it instead to prohibit retaliation when the employer *perceives* that an employee has participated in a [protected activity]") (emphasis in original). We are persuaded by this rationale. Therefore, it is irrelevant whether the University mistakenly perceived that Attieh had engaged in a protected activity because statutorily it could not retaliate against her until she actually did so. Likewise, the mere anticipation that Attieh might engage in a protected activity in the future is insufficient to establish that the University retaliated against her under the statute.

We hold that Attieh did not establish a prima facie case of retaliation because she did not establish that she engaged in a protected activity.[5] We overrule Attieh's first issue.

**Equal Pay**

In Texas, a woman who performs a public service for the state is entitled to be paid the same compensation as is paid to a man who performs the same kind, grade, and quantity of service. Tex. Gov't Code Ann. § 659.001 (West 2004). We agree with the parties that a prima facie case under the Texas statute requires the same showing as federal law. *See* 29 U.S.C. § 206(d); *see also Georgen-Saad v. Texas Mut. Ins. Co.*, 195 F. Supp.2d 853, 858 (W.D. Tex. 2002). A plaintiff establishes a prima facie case under the federal law if it can be shown that (1) the employer is subject to the Act; (2) the plaintiff performed work in a position requiring equal skill, effort, and responsibility under similar working conditions; and (3) the plaintiff was paid less than the employee of the opposite sex providing the basis of comparison. *Chance v. Rice Univ.*, 984 F.2d 151, 153 (5th

---

[5] Attieh also argues that the University's actions after her April 7, 2000 letter were unlawful and were made in response to her letter. Specifically, Attieh claims that following actions were unlawful: (1) Liebowitz's open opposition to her appointment for a terminal year; (2) moving her office to a separate building where she did not have access to Department resources; and (3) the University's failure to renew her teaching contract. In order for an employment decision to be adverse or unlawful it must be an "ultimate employment decision." *Elgaghil v. Tarrant County Junior Coll.*, 45 S.W.3d 133, 142 (Tex. App.—Fort Worth 2000, pet. denied) (citing *Messer v. Meno*, 130 F.3d 140 (5th Cir. 1997)). Ultimate employment decisions that are actionable include decisions to hire, discharge, promote, compensate, or grant leave, but not events such as disciplinary filings, supervisor's reprimands, or even poor performance reviews. *Id*. at 143. Therefore, Liebowitz's opposition to Attieh's terminal year appointment and the decision to move her office to a separate building are not ultimate employment decisions. While the University's decision not to renew Attieh's teaching contract was an ultimate employment decision, it was effectively made prior to her letter when the Senior Lecturer position was eliminated. Accordingly, it was not made in retaliation for the protected activity of writing the letter on April 7, 2000.

14

Cir. 1993). Two jobs are not equal when one position requires additional tasks that require extra effort. *See Brennan v. Victoria Bank & Trust Co.*, 493 F.2d 896, 898 (5th Cir. 1974).

Attieh claims that a genuine issue of material fact exists regarding whether she performed work requiring equal skill, effort, and responsibility under similar working conditions as the new male associate professor, Dr. Mohammed. She insists that we must look beyond the titles of the two positions and consider the actual work performed. By doing this, she contends that we will find that her position required that she perform as much, if not more work than Mohammed.

Attieh and Mohammed did perform many of the same duties. They were both coordinator of the Arabic language program, language instructors, and in charge of managing the teaching assistants and assistant instructors. They both maintained similar course loads and held positions on various departmental committees.

Nevertheless, the Associate Professor position also required additional work. In his affidavit Dr. Stephen Monti, Executive Vice Provost for the University, explained that an Associate Professor is expected to excel in scholarship, teaching, and service. In addition, an Associate Professor is expected to participate in administrative governance functions. Senior Lecturers, on the other hand, are hired to support the University's instructional mission and are not expected to achieve comparable performance levels in the areas of scholarship and departmental service. Thus, while Attieh and Mohammed may have had comparable instructional duties, Mohammed's position as associate professor entailed additional responsibilities. Moreover, it is not enough that Attieh might have qualified for the Associate Professor position, or that she performed some tasks that were similar to those subsequently performed by Mohammed. *See Gunther v. County of Washington*, 623

15

F.2d 1303, 1309 (9th Cir. 1979) (holding that overall job, not individual segments must form basis of comparison); *see also Klindt v. Honeywell Int'l, Inc.*, 303 F. Supp.2d 1206, 1220 (D. Kan. 2004) (*citing Nulf v. International Paper Co.*, 656 F.2d 553, 560-61 (10th Cir. 1981)) ("It is not sufficient that some aspects of the two jobs were the same."). Therefore, we conclude that Attieh did not establish that the Senior Lecturer position, without tenure, is substantially similar to the tenured Associate Professor position. Consequently, we hold that she did not state a prima facie case under the Texas Equal Pay statute. *See* Tex. Gov't Code Ann. § 659.001. We overrule Attieh's second issue.

## CONCLUSION

Because we hold that Attieh failed to make out a prima facie case of either retaliation or a violation of the equal pay statute, we conclude that summary judgment was proper. Consequently, we affirm the trial court's judgment.

Bea Ann Smith, Justice

Before Justices B. A. Smith, Puryear and Pemberton

Affirmed

Filed: June 16, 2005

16