**Patricial DRAKE**

v.

**MAGNOLIA MANAGEMENT CORPORATION.**

No. Civ. A.99–3336.

United States District Court, E.D. Louisiana.

Oct. 5, 2000.

Thomas Joseph Hogan, Jr., Hogan & Hogan, Hammond, LA, for Patricia Drake, plaintiff.

Charles A. Schutte, Jr., Guglielmo, Marks, Schutte, Terhoeve & Love, Baton Rouge, LA, for Magnolia Management Corporation, defendant.

## ORDER AND REASONS

LEMMON, District Judge.

**IT IS HEREBY ORDERED** that Magnolia Management Corporation's motion for partial summary judgment is **GRANTED.** (Document # 15.)

## I. BACKGROUND

Magnolia Management Corporation (Magnolia) operates Landmark Nursing and Rehabilitation Center (Landmark), a nursing facility in Hammond, Louisiana, under a contract with the owner, Monroe Manor Limited Partnership. On March 30, 1998, Todd Robertson, the administrator of Landmark, hired Patricia S. Drake as Landmark's director of nursing. Drake was born on September 23, 1949, and was 49 years old at the time. Within seven months, on November 5, 1998, Robertson, as the decision-maker for Magnolia, terminated Drake's employment and hired 41–year–old Carolyn D'Amico as her replacement.

Drake filed a charge of employment discrimination with the District Office of the Equal Employment Opportunity Commission (EEOC). On September 10, 1999, the EEOC was unable to conclude that there was a violation, dismissed the claim, and issued a notice of Drake's right to sue.

On November 3, 1999, Drake filed a complaint against Magnolia[1] alleging discrimination under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.* and La.Rev.Stat. 23:311 *et seq.* and sexual discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and La.Rev.Stat. 23:332. Magnolia filed a motion for partial summary judgment.[2]

---

1. A Title VII suit against an employee is actually a suit against the corporation. *See Indest v. Freeman Decorating, Inc.,* 164 F.3d 258, 262 (5th Cir.1999).

2. Magnolia did not address the state law claims in its motion for summary judgment.

## II.  DISCUSSION

### A.  Summary judgment standard

Summary judgment is proper when, viewing the evidence in the light most favorable to the non-movant, "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." *Amburgey v. Corhart Refractories Corp.*, 936 F.2d 805, 809 (5th Cir.1991); Fed.R.Civ.P. 56(c). If the moving party meets the initial burden of establishing that there is no genuine issue, the burden shifts to the non-moving party to produce evidence of the existence of a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The nonmovant cannot satisfy the summary judgment burden with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (en banc). A fact is "material" if its resolution in favor of one party might affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. *Id.* If the opposing party bears the burden of proof at trial, the moving party does not have to submit evidentiary documents to properly support its motion, but need only point out the absence of evidence supporting the essential elements of the opposing party's case. *Saunders v. Michelin Tire Corp.*, 942 F.2d 299, 301 (5th Cir.1991).

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court "established an allocation of the burden of production and an order for the presentation of proof in Title VII discriminatory-treatment cases" and ADEA claims *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 2746, 125 L.Ed.2d 407 (1993); *Reeves v. Sanderson Plumbing Products, Inc.*, —— U.S. ——, ——, 120 S.Ct. 2097, 2105, 147 L.Ed.2d 105 (2000). First, the plaintiff must establish a *prima facie* case of dis-

crimination. The elements of a plaintiff's *prima facie* case vary according to the facts of the case and the nature of the claim. *See LaPierre v. Benson Nissan, Inc.*, 86 F.3d 444, 448, n. 3 (5th Cir.1996). "Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). The burden then shifts to the defendant to produce a legitimate, nondiscriminatory reason for the conduct. *See Reeves*, 120 S.Ct. at 2106. This burden is one of production, not persuasion and involves no credibility assessment. *Id.* If the defendant meets the burden, the presumption raised by the plaintiff's *prima facie* case disappears. Once the employer produces sufficient evidence to support a nondiscriminatory explanation, the plaintiff is given an "opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were pretext for discrimination." *Id.* (internal quotation and citation omitted). The ultimate burden of persuading the trier of fact that there was intentional discrimination and that the professed reason was not the true reason remains with the plaintiff. *Id.* "[A]lthough the presumption of discrimination drops out of the picture once the defendant meets its burden of production, the trier of fact may still consider the evidence establishing the plaintiff's *prima facie* case and inferences properly drawn therefrom ... on the issue of whether the defendant's explanation is pretextual." *Id.* (internal quotation and citation omitted).

### B.  ADEA claim

Drake alleges in the complaint that Robertson discriminated against her because of her age. In support of her claim, Drake enumerates the following instances in which Robertson commented on her age or the age of others:

> Mr. Robertson hired two nurses without the Director of Nursing or the Assis-

tant Director of Nursing interviewing them. One was a weekend supervisor, and the other was to supervise the Medicare Unit. Both were under the age of 40; Mr. Robertson described them as "cute and Peppy", the implication being that those were definite qualifications. I do not recall seeing the applications of either of these employees. The Director of Nursing or the Administration of Nursing usually does the hiring of new personnel. I cannot recall Mr. Robertson ever hiring an employee over the age of 40.

Mr. Robertson called a female family member who was over 40 "an old, fat cow."

When the Regional Administrator was expected to visit the nursing facility, Mr. Robertson told the younger female staff to "wear your short skirts—Rick is coming tomorrow." Mr. Robertson made this comment many times.

When a female employee voiced concern about an audit to be done by the Regional Administrator, Mr. Robertson said to her: "Don't worry, you're cute and he likes you."

.    .    .    .    .

Mr. Robertson told me on several occasions that I was "old." Mr. Robertson gave the clear impression that he did not like anyone whom he considered "old" around, and that he did not feel anyone "old" was up to the job.

In her deposition, Drake elaborated on the occasions on which Robertson commented on her age. During the second interview for the position, Drake and Robertson discussed her educational background, including the year she graduated. Drake stated that Robertson made a reference to her age as being close to his parents' age. After she was hired, Drake presented Robertson with her driver's license and social security card in order to complete the paperwork for her employment. According to Drake, Robertson

stated that her birth in 1949 was "a long time ago." Further, Drake alleges that, on several occasions, Robertson called her "Mom."

■ Under the ADEA, it is "unlawful for an employer ... to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). An employee who is younger than 40 is outside the class of older workers as defined by the ADEA. 29 U.S.C. § 631(a). In disparate treatment claims, liability depends on whether age motivated the employer's decision. *See Reeves*, 120 S.Ct. at 2105. "[T]here is no disparate treatment under the ADEA when the factor motivating the employer is some feature other than the employee's age." *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 113 S.Ct. 1701, 1705, 123 L.Ed.2d 338 (1993). The plaintiff's age must have "actually played a role in [the employer's decisionmaking] process and had a determinative influence on the outcome." *Id.* at 1706. "It is the very essence of age discrimination for an older employee to be fired because the employer believes that productivity and competence decline with old age." *Id.*

■ To establish a *prima facie* case of age discrimination, Drake must demonstrate that, at the time she was fired, she was a member of the class protected by the ADEA, she was otherwise qualified for the position of director of nursing, she was discharged by Magnolia, and that she was either replaced by someone outside the protected class, replaced by someone younger, or otherwise discharged because of age. *See Bodenheimer v. PPG Indus. Inc.*, 5 F.3d 955, 957 (5th Cir.1993).

It is undisputed that Drake was 50 years old when she was terminated as director of nursing at Landmark and that she was replaced by a 41–year–old woman.[3] Mag-

**3.** Because Drake was replaced by a younger woman, the court need not address, in the

context of establishing a *prima facie* case, the allegations of specific comments concerning

nolia contends, however, that Drake cannot establish a *prima facie* case because she was not qualified for the position. Alternatively, Magnolia argues that, even if Drake can establish a *prima facie* case, Magnolia had a legitimate non-discriminatory reason for terminating Drake's employment.

Magnolia contends that the nursing home had not been properly operated prior to February 1, 1998, when it took over the management, requiring reorganization and implementation of Magnolia's policies and procedures. Magnolia contends that Drake did not have the organizational skills and knowledge to turn around the operation in compliance with Magnolia's policies and procedures.

Magnolia presents documentary evidence of "Nurse Consultant Quality Assurance Reports" for April through October 1998, prepared by Diane Gaston, a 53–year–old registered nurse consultant assigned to inspect Landmark. The most significant deficiency noted in Gaston's reports, and the alleged basis for Drake's termination, is Drake's failure to assess timely each resident, develop an appropriate care plan, update and enter into the computer the Minimum Data Set (MDS),[4] and transmit the MDS reports to the Department of Health and Hospitals for the State of Louisiana (DHH).[5]

On October 21, 1998, Gaston wrote a letter to Harold Gamburg, the president of Magnolia to advise him of her recent findings at Landmark. Copies of the letter were sent to Rick Delrie, the regional administrator, and Todd Robertson. Gaston stated as follows:

1. Electronic submission. Facility appears not to have submitted since September 18, 1998. Will verify with Cathy

Brunson when she returns October 23, 1998. Facility Computer shows NO assessments on 18 residents since September 1, 1998.

2. MDS/Care Plan Process is not being done correctly. No team approach, no staffing notes, not working RAPS/Triggers and process has been previously discussed with the team.

3. Medicare Nurse not doing own MDS because on some days she does not have a Nurse for that unit. Position approved but no follow up.

4. DON has an office, but no desk or chair. How is she expected to work effectively?

5. Physical Therapy has been doing wound care in this facility without following Corporate procedure for implementing wound care. Discontinued October 21, 1998.

In response to Gaston's report, Robertson wrote a letter to Drake discussing the problems discovered by the corporate nursing consultant. Robertson told Drake that he was extremely disappointed regarding the MDS/Care Plans because he had been told at each morning "Quality Assurance" meeting that they were timely, complete, and transmitted. Robertson stated further:

As the Director of Nursing, you are to assure the organization and performance of your staff and department. The *scope, severity,* and *length* to which these problems have occurred demonstrates a lack of follow-up by you and the administrative staff of the nursing department. I expect the problems listed below to resolve within the next ten days. At the completion of this time, Mrs. Diane Gaston and I will evaluate

---

age made over time. *See Brown v. CSC Logic, Inc.,* 82 F.3d 651, 655–56 (5th Cir.1996).

4. An MDS is a compilation of information on each resident describing his condition and stating the established plan for the resident's care. In order to maintain funding for each resident's care, Magnolia was required by DHH regulations to assess each patient, mod-

ify the care plan, update the MDS, and follow the care plan until and updated MDS was submitted to DHH.

5. The submissions are required by law, and Landmark is subject to penalties, including a cutoff of funding under Title XIX, if submissions are not made.

these areas for completion and correctness.

During this ten day time frame, you are to ensure that corporate procedures for the submission of MDSs are followed and that all delinquent submissions are corrected and transmitted. Additionally, you will assure that all face sheet information which is to be entered by the Medical Records person is corrected and updated.... It is your responsibility, through your care plan coordinator, to ensure that all care plans are completed and signed timely. Also, it is the responsibility of your care plan coordinator to report to you the status of quarterly notes from each department on the interdisciplinary team.... Weights have not been taken and recorded according to company policy. This has been discussed in June, July, and August, however, this problem has yet to be resolved. All resident weights are to be taken and recorded according to company policy by Monday, October 26 at 3:00 pm.... Also, approval was granted over a month ago to add an additional nurse to the medicare unit on the 7–3 shift, however this position has yet to be filled consistently. If this position were filled, it would allow the RN Case Manager to complete the MDSs and Care Plans on the Medicare Unit.... Have this position filled within the next 10 days. Lastly, while I am aware of friction between the nursing and dietary departments, I expect better cooperation and team work from both departments. I will no longer act as a mediator between grown adults.... I have also spoken to the dietary supervisor about my concerns, and informed her as I am informing you, that team work is essential for continued employment.

In closing, I am quite confident that this problem can be resolved positively. I am willing to assist you in any manner possible. However, I want to stress that their [sic] are no "sacred cows" in this facility, this includes both you and I. If your staff are failing to achieve your expectation, not responding to our training efforts, or not complying with corporate policy, you are obligated to discharge them from employment. I expect a plan of correction on the above listed items by Monday morning [October 26th] at 9:00am.

Drake signed Robertson's letter to acknowledge that she received it, and on October 26, 1998, Drake submitted a letter to Robertson outlining a corrective action plan. On November 3, 1998, she requested an extension of five days because she was not able to complete the work by the November 4, 1998 deadline. Robertson determined that the process had gone on too long and terminated Drake on November 5, 1998.[6]

In his deposition, Robertson stated that he thought he was getting someone with leadership and managerial ability when he hired Drake because she had experience as both a director of nursing and as an administrator. He felt that it should have been Drake, not Gaston, that diagnosed the problems in the facility. As the director of nursing, she had the responsibility to make sure that the entire department was organized and operating, and she should have known that she had not been asked to sign the MDS reports and care plans. Magnolia presents documentary evidence of the director of nursing's job description to support Robertson's testimony. Robertson further testified that he approved unlimited overtime to get the job done, but he was not able to get Drake to implement Magnolia's policies and procedures. Robertson stated that his ten-day time frame to complete 18 MDS reports and care plans was more than generous because it represented fewer than two a day. Robertson contrasted Drake's performance with D'Amico's accomplishments after she was hired. D'Amico put procedures into effect immediately and stabi-

6. Other employees responsible for the failure to make electronic submissions were also re- placed, including the assistant director of nursing and resident service director.

lized the organization within four or five months. Moreover, Robertson stated that it was his belief that Drake precipitated the friction between nursing and the other department heads, specifically the housekeeping and dietary departments.

D'Amico stated in her deposition that an extended state survey was taken approximately three weeks after she took over as the director of nursing and that the results were not good. An ascending scale of deficiencies were expressed as "tags" from "A" to "L". An "H" tag was received because there was no procedure in place whereby physicians would be notified timely of a change in the patients' condition. Landmark received some "B" tags because the MDS reports and care plans had not been completed and the nurse's aides had not received in-service training. Further, Gaston's reports indicate that some of the deficiencies were reported three times because the problems had not been corrected. When Landmark had its annual state and federal surveys in July 1999, the results were better, but the facility was not yet deficiency free.

To support the contention that Drake's termination was based on performance, Magnolia presents the decision of the administrative law judge regarding Drake's application for unemployment benefits:

The claimant was discharged from her job because she did not meet her employer's expectations and/or because of alleged poor job performance. The two seem to go hand and hand. Poor job performance is judged by an employer's expectations. The employer readily agrees that the facility was having major problems when the new company took over. The administrator inherited those problems. The claimant was hired just one month later. She inherited the problems which were left over by the other company. I feel that the claimant's job performance was inadequate according to the employer's expectations, but that does not mean that her job performance would have been inadequate compared to another employer's expectations. In a discharge situation an employer must prove by a preponderance of the evidence that the discharge was for deliberate or willful misconduct connected with the employment if it expects that unemployment insurance benefits will be denied. The employer has not met this preponderance of the evidence. Benefits will not be denied.

■ Assuming *arguendo* that Drake has established a *prima facie* case, the court finds that Magnolia has met its burden of producing a non-discriminatory reason for her termination, and the presumption raised by Drake's *prima facie* case disappears. Moreover, the facts of this case give rise to an inference that age was not the motive behind Drake's termination because the "same actor" who hired her terminated her. *See Brown v. CSC Logic, Inc.*, 82 F.3d 651, 658 (5th Cir.1996). The rational behind the inference is as follows:

[c]laims that employer animus exists in termination but not in hiring seem irrational. From the standpoint of the putative discriminator, [i]t hardly makes sense to hire workers from a group one dislikes (thereby incurring the psychological costs of associating with them), only to fire them once they are on the job.

*Id.* (internal quotation and citation omitted).

Drake argues that the "same actor" inference does not apply in this case because, at the time she was hired, she was the only viable candidate, and Robertson did not have a choice. Drake provides no authority for disregarding the "same actor" inference or evidence to support her assertions that she was the only candidate available to assume the director of nursing position. The undisputed evidence indicates that Drake was hired because she had the qualifications and background for the job.

The evidence shows that Robertson knew how old Drake was when he interviewed her, he hired her anyway, and he fired Drake approximately seven months later. These facts give rise to the infer-

ence that employer animus did not exist in termination because it did not exist in hiring. Drake has not demonstrated that the "same actor" inference is not appropriate in this case, and the burden now shifts to Drake to present evidence to overcome the inference that the stated reason is not a pretext.

Drake asserts that Magnolia's reasons for termination are pretext. Drake contends that Robertson never allowed her to continue as the director of nursing because she did not fit his profile of a female employee. She argues that she must have been doing something right because the number of patients in the nursing facility rose from 103 when she arrived in March 1998 to 129 when she was terminated in November 1998. Drake further contends that the problems with the MDS transmissions were not solely her responsibility and must be shared by the administrator and the resident services director. She asserts, in a conclusory manner, that they were not terminated because they were both younger than she. Drake maintains that the MDS process was affected by a turnover in personnel, a general unfamiliarity with Magnolia procedures on the part of responsible employees, a backlog of work left by the previous employee, a lack of training, a change in computer programs, and a lack of necessary equipment. Drake contends that the additional problems with observing and recording the residents' weight, measuring the meal intake, and failing to require the physicians to sign the care plans were not due to lack of leadership on her part, or that the problems occurred after her termination.

After considering all of the documentary evidence and deposition testimony, including the statements attributed to Robertson, the court concludes that Drake has not presented evidence that Magnolia's stated reason for her termination is pretextual. The facility housed only 79 residents when Magnolia assumed its management and was not in good working order when Drake was hired as director of nursing. Although Drake may have been qualified for other nursing positions, the rec-

ords demonstrate that she was unable to perform the difficult task of organizing and implementing Magnolia's procedures at Landmark. Because Drake has not met her burden of establishing by a preponderance of the evidence that the reasons offered by Magnolia were not the true reasons for her termination, Magnolia is entitled to judgment as a matter of law on the age-discrimination claim.

## C. Title VII claims

Drake alleges that she was discriminated against in violation of Title VII because she was subjected to a hostile work environment, sexual discrimination, and retaliation for complaining about the conduct. Drake asserts in her answer to interrogatories that Robertson made the following statements relating to sex or gender in the workplace:

At a Magnolia meeting in the spring of 1999, someone stated that men were more dishonest, etc., than women. When I brought this up later at lunch, Mr. Robertson, in all seriousness, gave a speech of how women cause men to steal and lie by demanding so many material things from men. I am not sure that this comment was meant for anyone but me; I am not sure that anyone but I heard it.

On one occasion, there was a new nurse at the nursing station with an elderly female resident who was in a wheelchair. Mr. Robertson grabbed the wheelchair and shouted to the resident "shut the fuck up." The nurse confronted him and said that this was verbal abuse and that he had no right to talk to the resident in that manner. The nurse did not know who Mr. Robertson was, and she later came to me expressing concern over having spoken to the Administrator that way. At the same time she was concerned that a person in his position would act so unprofessionally and abusively toward a resident.

.     .     .     .     .

Mr. Robertson pronounced on numerous occasions that "Women are only good for one thing", and "Women are the root of all evil."

Mr. Robertson often talked about a married couple in the facility and said that the wife had "the balls" in the family. He then began to say the same thing at a Resident Family Council Meeting. I, as a Director of Nursing, interrupted him since I felt that he was betraying confidentiality and that he was not acting in a professional manner.

Mr. Robertson repeatedly called his live-in girlfriend his "Ho". When I told him he should not say that if he loved her, he responded "She lives with me and sleeps with me so she is a Ho." When another female manager began to object, Mr. Robertson repeated the statement again.

Mr. Robertson habitually called female employees "angel", or "darling".

Mr. Robertson said many times that a female employee looked "hot" that day, or that she was a "babe."

At a seminar in Baker, Mr. Robertson spoke enviously about another administrator who had several female staff members present, and said that that particular administrator only hired "lookers and had a fine stable."

Mr. Robertson called a female whom he saw in the building, "a looker", and made inquiries about her until he found out who she was and why she was in the building.

Whenever executives from Magnolia were expected to come for a tour of the building, Mr. Robertson would instruct the female employees to "wear your short skirts, smile, and be friendly."

Mr. Robertson called three nurses who were at the nursing station "lazy bitches."

The Regional Administrator, Rick Delrie, asked Mr. Robertson once who the new nurse was. The words he used were: "Who is the amazon?"

I made it clear to Mr. Robertson that his comments made me and the other female staff members uncomfortable, and that counseling his female staff members to wear short skirts could be construed as sexual harassment. Mr. Robertson just laughed at our concerns and continued to behave as before. He had nothing to fear in this regard from his superiors, as evidenced by Mr. Delrie's comment about the "amazon."

**1. Hostile work environment**

Magnolia asserts that Drake was not the subject of harassment based on her gender and that Robertson's statements, if made at all, were simply "stray remarks." Magnolia argues that the alleged harassment was not sufficiently pervasive or severe to create an abusive environment and the alleged statements did not interfere with Drake's work or job performance.

To support a hostile work environment sexual harassment claim, an employee must show that

(1) she belongs to a protected group; (2) she was subject to unwelcome sexual harassment; (3) the harassment complained of was based upon sex; (4) the harassment complained of affected a term, condition, or privilege of employment (i.e., that the sexual harassment was so pervasive or severe as to alter her conditions of employment and create an abusive working environment); and (5) the employer knew or should have known of the harassment and failed to take prompt remedial action.

*Farpella–Crosby v. Horizon Health Care,* 97 F.3d 803, 806 (5th Cir.1996). "To be actionable, the challenged conduct must create an environment that a reasonable person would find hostile or abusive." *Id.* "Not all harassment will affect a term, condition, or privilege of employment." *Shepherd v. Comptroller of Public Accounts of the State of Texas,* 168 F.3d 871, 874 (5th Cir.1999). Title VII was designed to bar severe and pervasive conduct that destroys a protected person's opportunity

to succeed in the workplace. *Id.* at 874. "Sexually discriminatory verbal intimidation, ridicule, and insults may be sufficiently severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment that violations Title VII." *Farpella–Crosby,* 97 F.3d at 806. Sex-neutral hostile conduct that is not based on protected status cannot be used to support a hostile environment claim. *Id.* at n. 2. All of the circumstances must be considered, "including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance." *Shepherd,* 168 F.3d at 874. "To be actionable, the challenged conduct must be both objectively offensive, meaning that a reasonable person would find it hostile and abusive, and subjectively offensive, meaning that the victim perceived it to be so. *Id.* If an employer knew or should have known of the employee's offensive conduct and failed to take steps to eliminate it, an employer is liable for the discriminatory acts of the employee". *Id.* at 807. "[S]imple teasing, offhand comments and isolated incidents (unless extremely serious) will not amount to discriminatory changes in 'terms and conditions of employment.'" *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998). "These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code." *Id.* at 2283–84.

█ The statements allegedly made by Robertson do not meet the demanding standard of Title VII. Drake concedes in her deposition that none of Robertson's "degrading" comments were directed at her. Further, Drake testified that she was never emotionally upset by the comments nor did they interfere with her ability to perform her job. She could not speak to the question whether the comments upset other women and offers no evidence in the form of affidavits or deposition testimony from any co-workers concerning Robert-

son's effect on the workplace environment. Further, Drake has not alleged that Magnolia knew or should have known that Robertson engaged in offensive conduct. Although Magnolia had a written policy against sexual harassment, Drake stated in her deposition that she did not file a formal complaint with any of Robertson's superiors, even though she had experience in discrimination and employment practices because she served on the EEOC committee in her previous position with the City of Columbus.

The court agrees with Drake's view that Robertson's "offensive utterances" were unprofessional and disrespectful toward women in general. However, she does not demonstrate that the comments were physically threatening or humiliating so as to amount to changes in the terms and conditions of her employment. Accordingly, Drake has not demonstrated a genuine issue that the harassment created a hostile work environment. Because Drake has not raised a genuine issue that the harassment affected the conditions of her employment, the court does not reach the question whether Magnolia knew or should have known of the harassment. The motion for summary judgment is granted on this claim.

## 2. Discrimination based on sex

█ Drake alleges in her complaint that her termination "was motivated by illegal discrimination because of sex." Title VII provides that "[i]t shall be an unlawful employment practice for an employer-(1) to fail or refuse to hire or to discharge any individual ... because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). To establish a *prima facie* case in a Title VII claim for sexual discrimination, a plaintiff must prove that

(1) she is a member of a protected class; (2) she was qualified for the position that she held; (3) she was discharged; and (4) after being discharged, her employer

replaced her with a person who is not a member of the protected class.

*Id.*

The parties agree that Drake has established the first three elements of her *prima facie* case. Magnolia argues that Drake is unable to establish the fourth element of a *prima facie* case because she was replaced by a member of the same protected class of which she is a member. The undisputed evidence show that Drake was replaced by Carolyn D'Amico, a 41–year–old married female. Accordingly, Drake has not come forward with evidence to establish a *prima facie* case that Magnolia unlawfully discriminated against her; therefore, Magnolia is entitled to summary judgment as a matter of law.

### 3. Retaliation claim

Drake contends that Robertson made numerous offensive remarks and that he continued the behavior even though she frequently asked him to stop. Drake argues that there is a causal connection between the complained of conduct and the adverse employment action because her complaints were directed at Robertson, and he was the person who fired her.[7]

In order to establish a *prima facie* claim of retaliation under Title VII, the plaintiff has "the burden of establishing that: (1) she engaged in activity protected by Title VII; (2) an adverse employment action occurred; and (3) there was a causal connection between the participation in the protected activity and the adverse employment action." *Messer v. Meno*, 130 F.3d 130, 140 (5th Cir.1997). "Protected activity" under Title VII includes making a charge against the employer or participating in any manner in a hearing concerning the charge. *See* 42 U.S.C. § 2000e–3(a). Title VII addresses ultimate employment decision, not every decision made by employers that have some effect upon ultimate decisions. *Id.* (internal quotations and citations omitted).

"Ultimate employment decisions include hiring, discharging, promoting, compensating, or granting leave, but not events such as disciplinary filings, supervisor's reprimands, and even poor performance by the employee—anything which *might* jeopardize employment in the future." *Id.*

Drake has not presented evidence to establish that there was a causal connection between her apparently casual and informal conversations with Robertson concerning his comments and the decision to terminate her employment. It is undisputed that Drake did not file a formal complaint with any of Robertson's superiors. Moreover, to the extent that her informal discussions with Robertson can be considered "protected activity," there is no evidence that there was any problem between Drake and Robertson when Drake called his attention to the offensive remarks. Accordingly, Drake has not carried her burden of establishing a *prima facie* retaliation claim, and Magnolia is entitled to summary judgment as a matter of law.

---

7. The court addresses this issue, even though it is far from clear that Drake alleged a retaliation claim in her complaint.