Peter J. BRENNAN, Secretary of Labor, United States Department of Labor, Plaintiff-Appellant,

v.

VICTORIA BANK AND TRUST COM-PANY, Defendant-Appellee.

No. 73–2075.

United States Court of Appeals, Fifth Circuit.

May 8, 1974.

Richard F. Schubert, Sol. of Labor, Donald S. Shire, Deputy Associate Sol., Carin Ann Clauss, Sandra P. Bloom, U. S. Dept. of Labor, Washington, D. C., Alfred G. Albert, Acting Sol. of Labor, U. S. Dept. of Labor, George T. Avery, Regional Sol., Dallas, Tex., for plaintiff-appellant.

Conde N. Anderson, Munson Smith, Victoria, Tex., for defendant-appellee.

Before JONES, THORNBERRY and COLEMAN, Circuit Judges.

COLEMAN, Circuit Judge:

This suit was initiated by the Secretary of Labor under § 17 of the Fair Labor Standards Act [1] (the Act), to enjoin the Victoria Bank & Trust Company of Victoria, Texas (the Bank), from violating the equal pay provisions of the Act and for back wages due certain female employees in the Note Department of the Bank.[2] The District Court found no

---

1. 52 Stat. 1060, as amended; 29 U.S.C., § 201 et seq.

2. 29 U.S.C., § 206(d)(1) states:

"No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the

violation on the theory that any differential in pay between male and female bank tellers was justified as a statutory exception. From this adverse determination, the Secretary appeals. We affirm as to the exchange tellers and reverse and remand as to the note tellers.

I

*The Exchange Tellers*

A. The basic difference between Exchange Tellers and Note Tellers

Within the Note Department of the Bank there existed a position entitled "exchange teller". It was manned by only one individual at a time and was located at a separate window, identified as the exchange window. The remainder of the tellers in the Note Department were designated note tellers. As to the exchange tellers, the Secretary would establish, on account of sex, unequal pay for equal work by three comparisons: (1) a comparison of the exchange teller and note teller positions; (2) a comparison of different salaries within the exchange teller position; and (3) a comparison of the different salaries within the note teller positions.

■ ·The Secretary first had to show unequal pay for jobs of equal work and responsibility. When this is done, the employer then has the burden of proving that any unequal pay results from some factor other than sex, Hodgson v. Brook-

haven General Hospital, 5 Cir., 1970, 436 F.2d 719.

■ The District Court found that any existing pay differential was explained by some permissible basis other than sex.[3] If the Court applied the proper legal standards, our review is to determine if his findings are supported by substantial evidence and thus not "clearly erroneous". If, however, an unexplainable difference in pay did exist, the amount is of no importance on the general issue of liability, Hodgson v. American Bank of Commerce, 5 Cir., 1971, 447 F.2d 416.

The District Judge found that the positions of exchange teller and note teller did not provide a proper comparison because that of exchange teller carried more responsibility and therefore justified higher pay. The criterion here was clearly delineated by this Court in Hodgson v. Brookhaven General Hospital, *supra*:

"The equal effort criterion has received substantial play in the reported cases to date. As the doctrine is emerging, jobs do not entail equal effort, even though they entail most of the same routine duties, if the more highly paid job involves additional tasks which (1) require extra effort, (2) consume a significant amount of the time of all those whose pay differentials are to be justified in terms of them, and (3) are of an economic value commensurate with the pay differ-

opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided*, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee."

3. The District Court opinion said:
"The Defendant bank has the burden of justifying the differences in pay between male and female employees. There is sufficient evidence to show that in this fluctuating situation the pay of the employees in question was dictated not by sex of the employees but by one of the following factors not based on sex: (1) merit and seniority; (2) the need to fill the exchange teller positions; (3) the need to transfer into the Note Department experienced employees from other departments; and (4) the need for a beginning salary range for new applicants."

ential. We are persuaded that this approach to the application of the statutory 'equal effort' criterion is in keeping with the fundamental purposes of the Equal Pay Act, and adopt it here." 436 F.2d at 725.

■ The record reflects that after a thorough internal assessment of its complete operation the Bank classified the exchange teller position in a higher grade than the note teller position. Of course, in Hodgson v. Brookhaven General Hospital, *supra*, we pointed out that the controlling factor in equal pay allocations has to be *job content*, not the job description prepared by the employer. Neither should the employer's rating of jobs be ignored simply because the employer made it, especially where, as here, the rating came after an extensive study of comparative qualifications, degrees of responsibility, and chances of loss to the Bank.

The duties of the exchange teller included income collections, payments on bonds, the sale of traveler's checks and cashier's checks, accounting for all traveler's checks and cashier's checks, including those sold by the note tellers, exchange of foreign currency, receipt of note payments on commercial and installment loans, and helping in the Note Department as needed.

On the other hand, the duties of the note tellers included receipt of payments on installment loans and the posting of such payments, setting up new commercial and installment loans, computing interest on loans, handling automatic charges against customers' accounts for payments on loans, and preparing various reports reflecting transactions and the status of the accounts in the Note Department.

■ The record is convincing that the duties of the exchange teller were more complicated and were such that errors *could not* easily be corrected in the internal operation of the Bank. The Note Department duties, however, were of such a nature that errors *could be* corrected within the internal operation

of the Bank. Furthermore, there was a specific duty upon the exchange teller to keep informed as to the current rates of exchange. An error there would be very difficult to correct. The chance of loss to the Bank was greater than with any duty of the note tellers. This, the lower court felt, led to greater responsibility in the exchange teller position and, therefore, validated any pay differential between the two positions. We agree.

While the record does reflect that on some occasions the note tellers would carry on the exchange tellers' function and vice versa, mainly when a rush period was experienced by one of the positions, the vast majority of the time the individual positions were actually manned by the person designated to do so. Furthermore, if a note teller was for some reason carrying on the duties of the exchange teller, the designated exchange teller was not relieved of the accountability and responsibility for the actions of the person carrying on the exchange teller duties.

The Bank has since discontinued the position of exchange teller. While this position was absorbed into the regular Note Department work, it was done so only after the Bank had transferred several experienced workers into the Note Department. This concerted effort to strengthen the Note Department resulted from a large turnover in personnel in that Department. After strengthening the Note Department with some longterm employees, the responsibilities of the exchange teller position were taken on primarily by an experienced employee. Although he didn't wait on customers, he did have full accountability for the transactions.

The Secretary infers that since the Note Department absorbed the exchange teller position and that since several experienced employees had been moved from exchange teller to note teller, the positions were of equal work and responsibility. However, in light of the differing duties and responsibilities, as well as the Bank's need to strengthen the Note Department, there is no reason for us to

stamp the findings as to differences in the nature of the work with the "clearly erroneous" label, Hodgson v. American Bank of Commerce, *supra*.

The Secretary further urges, however, a comparison of the salaries paid to the various individuals who, at one time or another during the period in question, occupied the position of exchange teller. In the first place, there is no question that the positions were equal, for they were the same. A meaningful comparison of the salaries paid the males and females, to say the least, is difficult because there was never more than one person at a time holding the exchange teller job. Consequently, the salaries sought to be compared existed at differing intervals of time, under varying price levels applicable at any particular point.

Hence, we conclude that none of the factors hereinabove discussed suffice to overturn the basic findings as to the exchange tellers.

B.  A Comparison of the Individuals
    and the salaries paid them as
    Exchange Tellers

Marjorie Chanek began with the Bank in the Note Department in February, 1960, at a salary of $175 per month. She became exchange teller in 1963 at a salary of $265. She left the position in 1965, when she was receiving $325.

Her successor was Carlton Speck. He had begun with the Bank in November 1954 as a bookkeeper. He was paid $410 a month as exchange teller, but it will be noted that he began work for the Bank six years before Mrs. Chanek did.

He, in turn, was succeeded in January 1969, by Mrs. Sharon Grammer. She had been employed at the Bank for one year, receiving $280 monthly as a note teller. Upon the new assignment, her salary was raised to $320. She, however, left the Bank after only six months as exchange teller. It had been understood from the beginning that she only wanted to work until her husband completed his education and she had been hired as a favor to her father, who was a good customer of the Bank, although it had a policy against short term employments.

Christopher Langenberg succeeded Mrs. Grammer. She trained him for two months before leaving the Bank. He started at a salary of $325. By February, 1971, he was receiving $395, at which time he was transferred to the Credit Department, where he is still employed.

The Bank explains Speck's higher salary, as compared to that of Mrs. Chanek, on the basis of five years added seniority and merit raises received accordingly.

The pay differential between Mrs. Grammer and Mr. Langenberg was explained on the basis that he expected to be a permanent employee, while it had been mutually agreed that Mrs. Grammer would only be a temporary one.

Obviously, these differences and the explanation offered can logically give rise to differences of inference and opinion. Nevertheless, viewed in their entirety we perceive no substantial basis for substituting our opinion, if we had one, for that of the trier of the fact. Close questions of this kind are peculiarly within his province and they do not lend themselves to a contrary appellate disposition.

C.  A Consideration of the Bank's Merit
    and Seniority Systems

The District Judge heavily relied on these systems as justification for the disparate salaries between men and women. The seniority evaluation was an annual undertaking. The Personnel Manager would pass out to the department heads forms on all employees. This form was filled out by the respective department heads as to each employee's present salary, last raise, and recommended raise. The form also

graded the people on their knowledge of the job, their ability in their present job, their ability to meet the public, and other general characteristics.

The Personnel Manager would then record what raise he recommended and pass the form on to the Operations Committee. The Operations Committee, upon consultation with the department heads, could adjust the individual's raise either up or down. The recommendation then went to the Management Committee for final approval. These longevity raises were usually standard, but some merit consideration was also involved.

The merit system that the defendant used approximated, in reality, the seniority system and dovetailed with it. In addition to the combined annual review, however, a department head could initiate the form on an outstanding employee during the year. Since merit evaluation was combined with the annual longevity review, the purely merit evaluation was rarely used.

■ It is clear that salary discrepancies could occur for people who have served in different departments. Their merit was, of course, measured in comparison with those doing the same work. Furthermore, a person might work for a while in a department where his assigned duties are not fitted to his specific nature or talents. Yet, in another department, this same individual might "find his true place". These factors could produce legitimate wage differentials for persons with equal longevity who have served in various departments throughout their tenures of employment. Also, the standard annual longevity raises could cause disparate wages among those with differing lengths of service.

The Act, of course, specifically provides an exception for disparate wages resulting from seniority and merit systems. In Hodgson v. Brookhaven General Hospital, *supra*, 436 F.2d at p. 726, we said that

"[t]he employer must show that its 'merit system' is administered, if not formally, at least systematically and objectively. Cf. 29 C.F.R. § 800.144."

■ Defendant's program was a systematic, formal system guided by objective, written standards. The record reflects several instances of the objectivity of the defendant's system where females were advanced over males as a result of the merit and seniority system. With the merit and seniority programs qualifying as exemptions under the Act, the District Court correctly held that disparities resulting from these programs were not in violation of the Act.

## II

### The Note Tellers

As to these employees, the record presents a different picture. A list of these employees, all female but one, will be set forth as an Appendix to this opinion, with comparative information as to each.

Since October, 1968, nine new note tellers have been hired and placed in the Note Department. The only male employee, who had no college education and no prior employment other than military, was started in April, 1970, at a salary of $325 per month. Obviously, seniority and job performance had nothing to do with this figure. The female employees began between October, 1968 and October, 1971, at salaries ranging between $280 and $300 per month, except for one who began at $325.

The District Court found that the individual salaries were based on "their college and work experience"; an aptitude test which required twelve minutes, the form and results of which are not in the record; and the assessment made by department heads and personnel managers made during interviews of the applicants' personality and apparent ability. The Court also held that free market forces in the employment market must be considered—that is, what salary will the best applicant accept and how badly does the Bank need to fill a particular position.

■ The Secretary argues that the use of the "market force" theory, i. e. a woman will work for less than a man, is not a valid consideration under the Act, Brennen v. City Stores, Inc., 5 Cir., 1973, 479 F.2d 235, fn. 12. See, also, Hodgson v. Brookhaven General Hospital, *supra*. With this concept we must agree.

It cannot unequivocally be said, however, that the District Judge applied this erroneous "market" standard. He states that the salary was that which the *best* applicant would accept. This, of course, seems to indicate that the lower court felt that, under the proper legal standard, the evidence showed that merit and benefit to the Bank were the sole salary considerations.

■ Even so, there is just not substantial evidence in the record to show that the disparate salaries paid the women were derived from factors other than sex. This burden belonged to the defendant and it was not met.

■ First, the subjective evaluations of the employer cannot stand alone as a basis for salary discrimination based on sex. If this were allowed, "the exception will swallow the rule". Cf. Shultz v. First Victoria National Bank, 5 Cir., 1969, 420 F.2d 648, 657. As to an aptitude test, the record fails to reveal the content or results of such a test. A look at the appendix shows that the factors of college education and work experience do not support the defendant's claim that the disparate pay was due to some factor other than sex. If any disparity should have existed as the result of education and work experience, some of the females should have been paid more than the male standard.

In comparing the male and female salaries of this group, the Secretary alleges as proper male standards Christopher Langenberg and Stephen Wallace. Langenberg, however, is not a proper standard for comparison, because, as explained above, he was hired solely for the exchange teller position and the exchange teller position is not one of equal work and responsibility and, therefore, not a proper standard for comparison.

■ The remaining male in this group of newly hired employees was Stephen Wallace. Mr. Wallace remained with the Bank but one month. For this reason, the District Judge found that as a short term employee, he could not be held to be a male standard. In this we think he misapprehended the effect of the evidence. The significance of the *initial salary* of an employee is of the utmost importance because in the case of a person starting at a lower salary it would be extremely difficult for the lower paid person ever to catch up under the seniority system of pay raises.

Defendant argues that all of its employees undergo a ninety day probationary system. A close examination of the record, however, indicates that the raise following the ninety day probationary period is, almost without exception, standard. In fact, the strongest inference gained from the record is that those started below $300 are raised $20 following the probation period, while those who start at $300 per month or more are raised $25 at the end of the probation period. Since Wallace was hired by the defendant with the full expectation that he would become a full-time employee, he is the proper male standard for comparison in relation to the beginning employees in his group.

Wallace was hired in April, 1970, and received a starting salary of $325 a month. He had no college education and almost no experience other than two years service in the Army.

Of the eight female employees, only Patricia Anderson was paid the same salary as Wallace. Mrs. Anderson was thirty-four years old with a considerable amount of previous work experience, yet she was paid the same as Wallace who had very little, if any, previous work experience.

The remaining seven new female employees were paid less than Wallace. Four of the seven remaining female employees had some college credit, ranging

from one semester to two years. They all had previous work experience, several as cashiers. Daphne Bryant, hired one year after Wallace, had been a cashier and salesgirl. She had one year of college. Her previous work experience, dealing with money and meeting the public, in addition to one year's formal secondary education, would appear to have qualified her for a salary at least equal to Wallace's. However, she was paid $25 a month less for the same work and responsibility.

A further example of the defendant's failure to satisfy the disparate results by reason of education and experience is illustrated by Yvonne Davidson. She had two years of college and a short experience with an insurance company. She was paid $290 a month.

We certainly cannot and do not say that each and every one of the newly hired females should have been paid $325. For example, Claudette Wells, although age twenty-seven, had no college education and her previous work experience was limited to domestic work. She did not have the qualifications the rest of the females possessed. Factors of this kind, wholly unrelated to sex, may be evaluated upon remand.

The Bank has not met its burden of proof of establishing any factor to explain the disparate salaries of the note tellers as between the male and female employees. The specific awards to which the female employees in the Note Department are entitled must be left to the District Court upon remand, with the caveat that the discrimination which existed may not be cured by lowering any salary, 29 U.S.C., § 206(d)(1).

As to the exchange tellers, affirmed.

As to the note tellers, reversed and remanded for further proceedings not inconsistent herewith.

APPENDIX

NEWLY HIRED EMPLOYEES—NOTE DEPARTMENT

| Name | Salary | Employed | Education | Employment | Age |
|------|--------|----------|-----------|------------|-----|
| Stephen Wallace | $325.00 | Apr. 1970 | No college | Army; Viet Nam Veteran | 21 |
| Jan German | 280.00 | Oct. 1968 | 1 sem. college | Receptionist for father | 19 |
| Sandra Bettis | 280.00 | May 1970 | No college | School District clerk | 19 |
| Claudette Wells | 280.00 | Aug. 1971 | No college | $1.00 an hour domestic work | 27 |
| Yvonne Davidson | 290.00 | June 1970 | 2 yrs. college | 1 month, Ins. Co. | 19 |
| Janet Fikes | 300.00 | Feb. 1971 | No college | Cashier, Woolco | 20 |
| Daphne Bryant | 300.00 | May 1971 | 1 yr. college | Cashier, pharmacy salesgirl, Grants | 21 |
| Dianne Talley | 300.00 | Mar. 1971 | 1 yr. college | Typing, telephone, parttime stenographer | 20 |
| Patricia Anderson | 325.00 | Oct. 1971 | No college | Husband, hospital School District | 34 |