TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-04-00450-CV







Aman Attieh, Appellant



v.



University of Texas at Austin, Appellee







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT

NO. GN104059, HONORABLE PATRICK O. KEEL, JUDGE PRESIDING





M E M O R A N D U M O P I N I O N


 Appellant, Aman Attieh, appeals the trial court's grant of summary judgment in favor
of appellee, University of Texas at Austin (the University). Attieh claims that her position as Senior
Lecturer was eliminated and that she was prevented from interviewing for a newly created Associate
Professor position in retaliation for complaints that she and others made regarding the allegedly
disparate treatment of herself and the Arabic language program by the University and its
representatives. Attieh also contends that the University violated the Texas Equal Pay statute. The
University avers that Attieh failed to make out a prima facie case on either of her claims and,
consequently, summary judgment was appropriate. Because we agree with the University, we affirm
the trial court's judgment.


BACKGROUND

 Attieh moved to America from Lebanon in 1972 to pursue a doctorate in education
at the University. Dr. Peter Abboud was one of Attieh's professors and served on her dissertation
committee. Attieh received her Ph.D. in 1978. That year she taught a series of courses at the
University and continued to do so until she moved to Saudi Arabia in the early 1980s. In 1984,
Attieh returned to the University as a lecturer specializing in the Arabic language. Her employment
at the University was subject to renewal annually and her position was not eligible for tenure.

 Over the years, Attieh and Abboud developed strong personal and professional bonds. 
In addition to their work at the University, they also taught at the Middlebury Summer Language
Program in Vermont each summer from 1984 to 1990.

 In 1994, the University created the Department of Middle Eastern Languages and
Cultures (the Department). The Department included the Arabic, Hebrew, Persian, and Turkish
language programs, as well as the Islamic and Jewish Studies programs. Abboud was appointed
Chair of the Department. While Chair, Abboud made Attieh chair of the Course and Curriculum
Committee, coordinator of the Arabic language program, and undergraduate advisor--even though
the positions were usually reserved for tenured faculty. Abboud also gave Attieh the largest office
of anyone in the Department, including himself. Additionally, Attieh was promoted to Senior
Lecturer during this time. Her new position remained subject to renewal annually and was not
eligible for tenure.

 In the Spring of 1998, the Dean of the College of Liberal Arts (the Dean) formed a
committee and charged it with investigating alleged problems within the Department. The
committee issued its report in April 1998 and found that (1) the Department would benefit from a
change in leadership; (2) there has been a lack of cooperation with the Center for Middle Eastern
Studies by the current Chair, Abboud, and some of the faculty members; (3) an outside review team
should evaluate the merit of the Arabic program's current policies, paying particular attention to
problems with student retention and attrition, student dissatisfaction and complaints, and inadequate
communication with other programs; and (4) the new Chair must have the authority to appoint a new
coordinator of the Arabic language program. The committee also found that:


Senior Lecturers in supervisory roles over tenured and tenure-track faculty is
problematic and undesirable. The complaints voiced by [Department] faculty about
the role of the Senior Lecturer . . . have to do with the multiple committee
appointments and administrative responsibilities made available to her by the Chair
[Abboud] as well as the extraordinary unofficial influence that the Chair has allowed
her to exercise in the running of the Department over the past four years. This
irregular situation, which disregarded proper professional consideration of rank,
equitable distribution of service opportunities among faculty, and good form, has had
unhealthy effects on the functioning and morale of the Department.



(Emphasis in original.)

 Immediately after the report was issued, Dr. Harold Liebowitz was appointed Chair
of the Department, replacing Abboud. Liebowitz is Jewish and teaches Hebrew. Soon after his
appointment, Liebowitz met with Attieh to discuss complaints regarding her teaching style and
methodology. Liebowitz outlined the areas in which Attieh should improve and also told her that
there had been allegations that she verbally abused her students. Attieh claims Liebowitz threatened
her with loss of her job if she did not change her methods. Attieh complained to the Dean and the
head of the University's grievance committee about the meeting, the alleged threat, and what she
perceived to be an attack on her academic freedom.

 In addition, Liebowitz requested that Attieh give up her large office so he could use
it as the Chair's office. Attieh objected, asserting that this action would break up the "Arabic
enclave," four adjacent offices that housed the Arabic language faculty and language lab. She
explained that students and faculty had agreed only to speak Arabic in this area and that Liebowitz's
presence would disrupt this practice and undermine the total immersion instructional method
employed by the Arabic language faculty. She argued further that she needed the larger office in
order to fulfill her duties as language coordinator. Ultimately, Attieh remained in the office and
Liebowitz moved into Abboud's former office.

 Shortly after his appointment as Chair, a student alleged that Liebowitz made a racist
remark about Palestinian Arabs while leading an archaeological dig in Israel. Liebowitz adamantly
denied having made the remark. Soon after this allegation, the Dean received a letter from Mark
Sullivan, a graduate student in Arabic literature, in which Sullivan expressed his concerns regarding
(1) the appointment of Liebowitz as Chair and the composition of the committee that appointed him;
(2) the perceived marginalization of the Arabic language program; (3) the need for tenure-track
positions for the Arabic program, especially for Attieh; (4) the lack of positions for Arabic program
faculty on Departmental committees; (5) the fact that Arabic language students received a
disproportionately lower number of Foreign Language Area Studies fellowships; (6) the perception
that the Arabic program is losing faculty due to the tension within the Department; (7) the failure to
mention the Arabic program in the Departmental newsletter; and (8) the racist remark allegedly made
by Liebowitz. The following month Liebowitz met with a student organization, the "Coalition of
Concerned Graduate Students," to address and attempt to alleviate student concerns regarding the
state of affairs in the Department.

 In late November 1998, Liebowitz called an emergency meeting to address the
"political issues" facing the Department. He stated that the "ongoing, debilitating, obstructionist,
and uncouth behavior on the part of three individuals" must end. (1) He further asserted his belief that
the student complaints pertaining to the marginalization of the Arabic program and accusations that
he is a racist were formulated with the input of certain faculty members and designed to harass and
vilify the Chair. Dr. Michael Hillman, a Professor of Persian Studies, attended the meeting and
claims that Liebowitz verbally attacked Attieh and that she left in tears. Hillman further stated that
after the meeting he and several other faculty members requested an outside review of the Arabic
language program.

 In December 1998, Liebowitz met with the Dean to discuss the departmental unrest.
The Dean proposed an outside review of the entire Department. After the meeting, Liebowitz wrote
a letter to the Dean that set forth the costs and benefits of an outside review. Liebowitz argued that
the review would be useless unless the reviewers have the ability to implement corrective measures
based on a thorough exploration of the entire Department. He noted that if the review resulted in
upgrading the Senior Lecturer position to a tenured or tenure-track position and Attieh is not hired
the University could expect a lawsuit. He also noted that the review process itself would be
disruptive, especially in light of his belief that certain faculty had already demonstrated a willingness
to incite students into raising "bogus and gratuitous issues" and "playing the race card."

 In the fall of 1999, Liebowitz requested an additional teaching position for the Arabic
language program. His request was approved on the condition that the new hire would come in as
a tenured Associate Professor. The Dean believed that this was necessary to ensure that the new
faculty member would be independent and not fearful of losing his or her job. Initially, Liebowitz
thought that the new professorship would be an additional position, but he soon learned that it would
replace the Senior Lecturer position, thereby eliminating Attieh's job. Attieh applied for the tenured
position, but was not selected for an interview. Abboud complained, suggesting that the posted job
description was tailored to impair Attieh's chances of selection, that the composition of the
committee was unfair, and that Attieh at least should have been granted an interview. Ultimately,
Dr. Mohammed Mohammed, a Palestinian Arab, was hired for the new position.

 On April 7, 2000, Attieh complained to the University's Equal Employment
Opportunity Office, alleging that she was denied the opportunity to interview for the new position
because of her "gender, race, and/or national origin." In July 2000, Attieh filed a discrimination
charge with Texas Commission on Human Rights complaining of gender and national-origin
discrimination, retaliation, and violations of the Equal Pay Act.

 Although Attieh's position was eliminated, she was allowed to return to the
University for the 2000-01 academic year so that she could teach second-year Arabic to her previous
first-year students and so she could have time to search for future employment. During this year,
Attieh was not on the Department payroll. (2) Additionally, her office was moved to another building. 
After leaving the University in 2001, Attieh was hired as a Senior Lecturer by Rice University.

 The University filed a traditional motion for summary judgment arguing that Attieh
had failed to establish a prima facie case on each of her claims. The district court granted the
University's summary-judgment motion, without explanation. This appeal followed.


STANDARD OF REVIEW


 We review the district court's grant of summary judgment de novo. Joe v. Two Thirty
Nine Joint Venture, 145 S.W.3d 150, 156 (Tex. 2004). When reviewing a summary judgment, we
take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and
resolve any doubts in the nonmovant's favor. Nixon v. Mr. Prop. Mgmt. Co., 690 S.W.2d 546, 548-49 (Tex. 1985). A defendant who moves for summary judgment under Rule 166a(c), as here, is
entitled to have its motion granted if it conclusively negates at least one of the essential elements of
the plaintiff's cause of action or if it conclusively proves each element of its affirmative defense,
thereby showing that it, as the movant, is entitled to judgment as a matter of law and no genuine
issues of material fact remain. Rhone-Poulenc, Inc. v. Steel, 997 S.W.2d 217, 222-23 (Tex. 1999). 
Only if the defendant meets its burden does the burden shift to the plaintiff, as the nonmovant, to
establish that a genuine issue of material fact remains. Tex. R. Civ. P. 166a(c). If the trial court does
not specify the grounds upon which the summary judgment was granted, as here, the judgment can 
be affirmed on any meritorious argument that was advanced in the pleadings. Dow Chem. Co. v.
Francis, 46 S.W.3d 237, 242 (Tex. 2001).


DISCUSSION


 In two issues on appeal, Attieh claims that genuine issues of material fact remain as
to whether she established a prima facie case on her retaliation and equal pay claims. We will
address each issue in turn.


Retaliation


 In order to establish a prima facie case of retaliation, Attieh must prove that (1) she
engaged in a protected activity; (2) the University took some unlawful employment action against
her; and (3) the University's unlawful employment action was due to her engagement in the
protected activity. Mayberry v. Texas Dep't of Agric., 948 S.W.2d 312, 315 (Tex. App.--Austin
1997, pet. denied). (3) The labor code sets forth four broad categories of protected activities. Section
21.055 provides that an employer commits an unlawful employment practice if the employer
retaliates or discriminates against a person who: (1) opposes a discriminatory practice; (2) makes
or files a charge; (3) files a complaint; or (4) testifies, assists, or participates in any manner in an
investigation, proceeding, or hearing. Tex. Lab. Code Ann. § 21.055 (West 1996). The University
contends that even when evidence in Attieh's favor is taken as true and all inferences are indulged
in her favor, Attieh cannot establish that she engaged in a protected activity. We agree.

 Attieh claims that her position was eliminated and that she was prevented from
interviewing for the new Associate Professor position in retaliation for complaints that she and
others made regarding the allegedly disparate treatment of herself and the Arabic program by
Liebowitz. After Liebowitz was appointed Chair of the Department Attieh, Abboud, and various
students complained, in letters and at meetings, about what they perceived to be the marginalization
of the Arabic language program. Attieh made various complaints about (1) the reduction in
resources for the Arabic language program and the effect of these reductions on the future quality
of the program, (2) the level of funding for the program, (3) Liebowitz's attacks on her teaching
methods, (4) possible infringement on her academic freedom, and (5) accusations that she verbally
abused her students and teaching assistants. However, Attieh never directly or indirectly voiced an
opinion as to whether the alleged disparate treatment of her and the Arabic language program was
based on race or national origin until her April 7, 2000 letter to the University's Equal Employment
Office. (4) Nevertheless, Attieh argues that when viewed in light of a long history of tension within
the Department between Jewish and Arabic faculty members, geopolitical history involving Jews
and Palestinian Arabs, and considering that Liebowitz, a Jew, allegedly made a disparaging remark
about Palestinian Arabs, her complaints constituted protected activity because they were
constructively complaints about discrimination.

 While we are to indulge all reasonable inferences in Attieh's favor, it would be
inappropriate for us to accept Attieh's characterization of the global relationship between Jews and
Arabs as evidence of the motivation for every administrative decision in the Department. The
evidence Attieh cites as proof of this contention simply does not support the inference that an
ethnicity-based conflict motivated the administrative changes. At best, Attieh's complaints concern
discrimination against the Arabic language program, not discrimination against her based on her race
or national origin. Additionally, the allegation that Liebowitz made a racist remark or complained
that certain faculty members of the Arabic language program had incited students into playing the
"race card" is not evidence that transforms Attieh's complaints about administrative decisions into
complaints about discrimination. In complaining about the changes under the new Chair, Attieh
never mentioned race or national origin. Therefore, Attieh did not put the University on notice that
she was complaining about unlawful discrimination, as opposed to administrative decisions. 
Consequently, her complaints about changes in the Department do not constitute a protected activity. 
See Booker v. Brown & Williamson Tobacco Co., Inc., 879 F.2d 1304, 1313 (6th Cir. 1989) (holding
vague charge of discrimination in internal letter or memorandum is insufficient to constitute
opposition to an unlawful employment practice); see also EEOC v. Crown Zellerbach Corp., 720
F.2d 1008, 1012-13 (9th Cir. 1983) (if statement does not mention specific act of discrimination,
employer must be able to discern from context of statement that employee opposes allegedly
unlawful employment practice); Azubuike v. Fiesta Mart, Inc., 970 S.W.2d 60, 65 (Tex.
App.--Houston [14th Dist.] 1998, no pet.) (vague charges of discrimination do not invoke statutory
protection).

 Attieh also avers that the complaints made by Abboud and various students can be
used to establish that she engaged in a protected activity. The plain language of labor code section
21.055 prohibits retaliation against a person who opposes a discriminatory practice. Thus, in order
for Attieh to establish that she engaged in a protected activity she must prove that she opposed the
University's allegedly discriminatory practices, not that third parties did. The fact that others also
complained provides no evidence that Attieh engaged in a protected activity.

 Liebowitz requested that faculty members talk to their students to dispel the
inflammatory racial allegations regarding him. Attieh suggests that her decision to do nothing in
response to this request constituted "passive opposition" to a discriminatory practice. Essentially,
Attieh is arguing that she perceived Liebowitz's request to be discriminatory but fails to explain why. 
Liebowitz did not tell the faculty to silence the students' protests; he only requested that they explain
to their students that he denied making the alleged disparaging remark and that the protests were
damaging to the Department. Furthermore, Liebowitz did not mandate that faculty members talk to
their students; he merely pointed out that it was in the Department's best interest that the infighting
cease. We cannot conclude that Liebowitz's request constituted a discriminatory practice, or that
Attieh's inaction constituted passive opposition to discrimination.

 Even if we were to conclude that Liebowitz's request was discriminatory, Attieh's
inaction would not have put either Liebowitz or the University on notice that she was opposing the
allegedly discriminatory practice. Liebowitz's request was not directed solely at Attieh. 
Consequently, it is possible that some faculty members spoke to their students while others did not. 
There is no evidence in the record indicating that Liebowitz attempted to determine which, if any,
of the faculty had spoken to their students. Attieh does not contend that either Liebowitz or the
University was aware of her decision not to talk to her students. In order for an employer to retaliate
against an employee for engaging in a protected activity, such as opposing a discriminatory practice,
the employer must actually know that the employee engaged in the protected activity. See Tex. Lab.
Code Ann. § 21.055. Here, there is no evidence that the University knew that Attieh was passively
opposing what she perceived to be a discriminatory practice. Therefore, the University could not
have retaliated against her for this behavior.

 We hold that Attieh has not raised a question of material fact as to whether she
actually engaged in a protected activity prior to her letter to the University's Equal Opportunity
Office on April 7, 2000, which was after the alleged retaliatory actions had been taken.

 Nevertheless, Attieh argues that she was retaliated against because the University
either perceived that she had engaged in a protected activity, or anticipated that she would do so. 
She insists that if we find a question of material fact as to either of these theories then the grant of
summary judgment was in error.

 But as we discussed above, labor code section 21.055 prohibits an employer from
retaliating against an employee who engages in a protected activity. Id.; Mayberry, 948 S.W.2d at
315. Consequently, a prima facie case is not established if the employee cannot demonstrate that she
actually engaged in a protected activity. Mayberry, 948 S.W.2d at 315. Attieh insists that we must
liberally construe remedial statutes, such as the anti-retaliation statute, and that the purpose of the
statute is not served by strictly adhering to the plain language. See Dennis v. Higgins, 498 U.S. 439,
443 (1991). Furthermore, she cites Fogelman v. Mercy Hospital, Inc., 283 F.3d 561, 571-72 (3rd
Cir. 1996), which holds that an employer's discharge of an employee for discriminatory reasons
amounts to illegal retaliation even if it is based on the employer's mistaken perception that the
employee engaged in a protected activity.

 The language of the anti-retaliation statute at issue in Fogelman differs significantly
from the Texas statute. Compare 42 U.S.C. § 12203(a) with Tex. Lab. Code Ann. § 21.055. The
Fogelman court held that the focus of the federal statute was on the employer's subjective reasons
for retaliating against an employee. Fogelman, 283 F.3d at 571. Hence, the court held that it did not
matter whether the "reasons behind the employer's discriminatory animus are actually correct as a
factual matter." Id. Thus, under the third circuit's construction of the federal statute, it is not
necessary that an employee actually engage in a protected activity. However, the plain language of
the Texas statute protects active participation in a protected activity. Our sister court in Waco has
rejected Attieh's suggestion that an employer's perception that an employee engaged in a protected
activity is a sufficient ground for a retaliation claim. See Salay v. Baylor University, 115 S.W.3d
625, 627 (Tex. App.--Waco 2003, pet. denied) ("Applying Fogelman . . . would effectively discount
the plain words of the statute requiring active participation, interpreting it instead to prohibit
retaliation when the employer perceives that an employee has participated in a [protected activity]")
(emphasis in original). We are persuaded by this rationale. Therefore, it is irrelevant whether the
University mistakenly perceived that Attieh had engaged in a protected activity because statutorily
it could not retaliate against her until she actually did so. Likewise, the mere anticipation that Attieh
might engage in a protected activity in the future is insufficient to establish that the University
retaliated against her under the statute.

 We hold that Attieh did not establish a prima facie case of retaliation because she did
not establish that she engaged in a protected activity. (5) We overrule Attieh's first issue.


Equal Pay


 In Texas, a woman who performs a public service for the state is entitled to be paid
the same compensation as is paid to a man who performs the same kind, grade, and quantity of
service. Tex. Gov't Code Ann. § 659.001 (West 2004). We agree with the parties that a prima facie
case under the Texas statute requires the same showing as federal law. See 29 U.S.C. § 206(d); see
also Georgen-Saad v. Texas Mut. Ins. Co., 195 F. Supp.2d 853, 858 (W.D. Tex. 2002). A plaintiff
establishes a prima facie case under the federal law if it can be shown that (1) the employer is subject
to the Act; (2) the plaintiff performed work in a position requiring equal skill, effort, and
responsibility under similar working conditions; and (3) the plaintiff was paid less than the employee
of the opposite sex providing the basis of comparison. Chance v. Rice Univ., 984 F.2d 151, 153 (5th
Cir. 1993). Two jobs are not equal when one position requires additional tasks that require extra
effort. See Brennan v. Victoria Bank & Trust Co., 493 F.2d 896, 898 (5th Cir. 1974).

 Attieh claims that a genuine issue of material fact exists regarding whether she
performed work requiring equal skill, effort, and responsibility under similar working conditions as
the new male associate professor, Dr. Mohammed. She insists that we must look beyond the titles
of the two positions and consider the actual work performed. By doing this, she contends that we
will find that her position required that she perform as much, if not more work than Mohammed.

 Attieh and Mohammed did perform many of the same duties. They were both
coordinator of the Arabic language program, language instructors, and in charge of managing the
teaching assistants and assistant instructors. They both maintained similar course loads and held
positions on various departmental committees.

 Nevertheless, the Associate Professor position also required additional work. In his
affidavit Dr. Stephen Monti, Executive Vice Provost for the University, explained that an Associate
Professor is expected to excel in scholarship, teaching, and service. In addition, an Associate
Professor is expected to participate in administrative governance functions. Senior Lecturers, on the
other hand, are hired to support the University's instructional mission and are not expected to
achieve comparable performance levels in the areas of scholarship and departmental service. Thus,
while Attieh and Mohammed may have had comparable instructional duties, Mohammed's position
as associate professor entailed additional responsibilities. Moreover, it is not enough that Attieh
might have qualified for the Associate Professor position, or that she performed some tasks that were
similar to those subsequently performed by Mohammed. See Gunther v. County of Washington, 623
F.2d 1303, 1309 (9th Cir. 1979) (holding that overall job, not individual segments must form basis
of comparison); see also Klindt v. Honeywell Int'l, Inc., 303 F. Supp.2d 1206, 1220 (D. Kan. 2004)
(citing Nulf v. International Paper Co., 656 F.2d 553, 560-61 (10th Cir. 1981)) ("It is not sufficient
that some aspects of the two jobs were the same."). Therefore, we conclude that Attieh did not
establish that the Senior Lecturer position, without tenure, is substantially similar to the tenured
Associate Professor position. Consequently, we hold that she did not state a prima facie case under
the Texas Equal Pay statute. See Tex. Gov't Code Ann. § 659.001. We overrule Attieh's second
issue.


CONCLUSION


 Because we hold that Attieh failed to make out a prima facie case of either retaliation
or a violation of the equal pay statute, we conclude that summary judgment was proper. 
Consequently, we affirm the trial court's judgment.



 

 Bea Ann Smith, Justice

Before Justices B. A. Smith, Puryear and Pemberton

Affirmed

Filed: June 16, 2005

1. Based on the record, we presume that Liebowitz was referring to Abboud, Attieh, and Dr.
Michael Hillman.
2. Attieh was paid as if she was a member of the Dean's staff.
3. In Texas, protection against employment discrimination is statutorily provided by chapter
21 of the labor code. An express purpose of labor code chapter 21 is to "provide for the execution
of the policies of Title VII of the Civil Rights Act of 1964 and its subsequent amendments." Tex.
Lab. Code Ann. § 21.001(1) (West 1996). Therefore, if necessary we look to analogous federal
statutes and the cases interpreting them when construing chapter 21. See Wal-Mart, Inc. v.
Canchola, 121 S.W.3d 735, 739 (Tex. 2003); see also Quantum Chem. Corp. v. Toennies, 47 S.W.3d
473, 476 (Tex. 2001).
4. Both Attieh and the University agree that Attieh's April 7, 2000 letter to the University's
Equal Employment Office was a protected activity.
5. Attieh also argues that the University's actions after her April 7, 2000 letter were unlawful
and were made in response to her letter. Specifically, Attieh claims that following actions were
unlawful: (1) Liebowitz's open opposition to her appointment for a terminal year; (2) moving her
office to a separate building where she did not have access to Department resources; and (3) the
University's failure to renew her teaching contract. In order for an employment decision to be
adverse or unlawful it must be an "ultimate employment decision." Elgaghil v. Tarrant County
Junior Coll., 45 S.W.3d 133, 142 (Tex. App.--Fort Worth 2000, pet. denied) (citing Messer v.
Meno, 130 F.3d 140 (5th Cir. 1997)). Ultimate employment decisions that are actionable include
decisions to hire, discharge, promote, compensate, or grant leave, but not events such as disciplinary
filings, supervisor's reprimands, or even poor performance reviews. Id. at 143. Therefore,
Liebowitz's opposition to Attieh's terminal year appointment and the decision to move her office
to a separate building are not ultimate employment decisions. While the University's decision not
to renew Attieh's teaching contract was an ultimate employment decision, it was effectively made
prior to her letter when the Senior Lecturer position was eliminated. Accordingly, it was not made
in retaliation for the protected activity of writing the letter on April 7, 2000.